Filed 2/22/19; Certified for Publication 3/25/19 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| SOUTH OF MARKET COMMUNITY ACTION NETWORK et al.,<br><br>　　　Plaintiffs and Appellants,<br><br>v.<br><br>CITY AND COUNTY OF SAN FRANCISCO,<br><br>　　　Defendant and Respondent;<br><br>FOREST CITY CALIFORNIA RESIDENTIAL DEVELOPMENT, INC., et al.,<br><br>　　　Real Parties in Interest and Respondents. | A151521<br><br>(San Francisco City & County Super. Ct. No. CPF-15-514691) |

　　　After preparing an environmental impact report (EIR) and holding public hearings, the City and County of San Francisco (City) approved a mixed-use business and residential project proposed by real parties in interest Forest City California Residential Development, Inc. and Hearst Communications, Inc. (collectively Forest City) in the area bounded by Mission, Fifth, Howard, and Sixth Streets in San Francisco. In approving the project, the San Francisco Board of Supervisors also voted to amend the San Francisco general plan to establish a Fifth and Mission Special Use District and approve the development agreement. South of Market Community Action Network (SOMCAN), Save Our SoMa (SOS), and Friends of Boeddeker Park (collectively plaintiffs)

challenged the environmental review by filing a petition for writ of mandate in the superior court. The trial court denied relief. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Forest City proposed the construction of a mixed-use development, the Fifth and Mission Project (the 5M Project or the project), covering four acres in downtown San Francisco. The 5M Project seeks to provide office, retail, cultural, educational, and open-space uses for the property, primarily to support the region's technology industry and provide spaces for coworking, media, arts, and small-scale urban manufacturing. The proposed project site is bounded by Mission Street to the north, Fifth Street to the east, Howard Street to the south, and Mary Street and several adjacent properties to the west. The existing area is occupied by eight buildings, with approximately 317,700 gross square feet (gsf) of office and commercial uses, as well as seven surface parking lots. The largest building in the existing space is the Chronicle Building, which is proposed to be renovated as part of the 5M Project.

The San Francisco Planning Department (Planning Department), as the lead agency responsible for administering environmental review of the project, released its draft EIR (DEIR) on October 15, 2014. The report described two "options" for the 5M Project, an " 'Office Scheme' " and a " 'Residential Scheme.' " Under both schemes, the project would result in new active ground floor space (with office, retail, educational, and cultural uses), office use, residential dwelling units, and open space. Both schemes would preserve and rehabilitate the Chronicle and Dempster Printing Buildings, demolish other buildings on site, and construct four new buildings with heights ranging from 195 to 470 feet. The overall gross square footage was substantially the same in both schemes, with varying mixes of office and residential uses. The office scheme had a larger building envelope and higher density than the residential scheme.

The DEIR discussed nine alternatives to the proposed project, rejecting five of them as infeasible. Among the four feasible alternatives, it considered: (1) a "No Project" alternative, (2) a "Code Compliant" alternative, (3) a "Unified Zoning" alternative, and (4) a "Preservation" alternative. The DEIR concluded the preservation

2

alternative was the environmentally superior alternative because it would "achieve some of the project objectives regarding the development of a dense, mixed-use, transit-oriented, job-creating project" but avoid the "irreversible impact" created by demolition of the Camelline Building, avoid regional pollutant impact, and reduce the transportation and circulation impacts.

The San Francisco Planning Commission (Planning Commission) held an informational hearing on the DEIR in November 2014 and accepted public comments through January 7, 2015. In August 2015, after further informational meetings, the Planning Department published its responses to public comments, which, together with the DEIR, made up the final EIR (FEIR).

Following a noticed public hearing, the Planning Commission certified the FEIR as complete, finding it to be adequate, accurate, and objective. The same day, the Planning Commission (1) adopted CEQA[1] findings, a statement of overriding considerations, and a mitigation monitoring and reporting program; (2) raised the shadow limit for Boeddeker Park (a park near the 5M Project); (3) approved a design for development document for the 5M Project; (4) recommended amendments to the general plan, San Francisco Planning Code, and zoning map to create the Fifth and Mission Special Use District; and (5) recommended adoption of a development agreement for the project.

Plaintiffs appealed the project approvals and certification of the FEIR to the San Francisco Board of Supervisors (Board). The Board denied the appeal and affirmed certification of the FEIR. Two weeks later, the Board adopted CEQA findings, and approved the Fifth and Mission Special Use District, the 5M Project, and the development agreement.

---

[1] California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.).

In December 2015, plaintiffs filed a petition for writ of administrative mandate in superior court, alleging CEQA violations and seeking to set aside certification of the FEIR and approval of the 5M Project. The court heard argument and denied the petition.

## II. DISCUSSION

### A. *CEQA Principles and Standard of Review*

Plaintiffs' appeal primarily challenges the content and analysis of the EIR. "The basic purpose of an EIR is to 'provide public agencies and the public in general with detailed information about the effect [that] a proposed project is likely to have on the environment; to list ways in which the significant effects of such a project might be minimized; and to indicate alternatives to such a project.' " (*Sierra Club v. County of Fresno* (2018) 6 Cal.5th 502, 511 (*Sierra Club*).) " ' "The EIR is the heart of CEQA" and the integrity of the process is dependent on the adequacy of the EIR.' " (*Rialto Citizens for Responsible Growth v. City of Rialto* (2012) 208 Cal.App.4th 899, 924.)

" ' " '[A]n EIR is presumed adequate (Pub. Resources Code, § 21167.3), and the plaintiff in a CEQA action has the burden of proving otherwise.' " ' " (*Preserve Wild Santee v. City of Santee* (2012) 210 Cal.App.4th 260, 275.) As our Supreme Court recently explained in *Sierra Club*: "The standard of review in a CEQA case, as provided in sections 21168.5 and 21005, is abuse of discretion. Section 21168.5 states in part: 'In any action or proceeding . . . to attack, review, set aside, void or annul a determination, finding, or decision of a public agency on the grounds of noncompliance with this division, the inquiry shall extend only to whether there was a prejudicial abuse of discretion.' [Citation.] Our decisions have thus articulated a procedural issues/factual issues dichotomy. '[A]n agency may abuse its discretion under CEQA either by failing to proceed in the manner CEQA provides or by reaching factual conclusions unsupported by substantial evidence. (§ 21168.5.) Judicial review of these two types of error differs significantly: While we determine de novo whether the agency has employed the correct procedures, 'scrupulously enforc[ing] all legislatively mandated CEQA requirements' [citation], we accord greater deference to the agency's substantive factual conclusions. In reviewing for substantial evidence, the reviewing court "may not set aside an agency's

4

approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable," for, on factual questions, our task "is not to weigh conflicting evidence and determine who has the better argument." ' " (*Sierra Club*, *supra*, 6 Cal.5th at p. 512.)

The court explained that this "procedural issues/factual issues dichotomy" has worked well for courts reviewing agency determinations. (*Sierra Club*, *supra*, 6 Cal.5th at p. 512.) Some procedural questions, such as whether the agency has provided sufficient notice and opportunity to comment on a draft EIR, or whether it has entirely omitted a required discussion, have clear answers. "But the question whether an agency has followed proper procedures is not always so clear. This is especially so when the issue is whether an EIR's discussion of environmental impacts is adequate, that is, whether the discussion sufficiently performs the function of facilitating 'informed agency decisionmaking and informed public participation.' " (*Id.* at pp. 512–513.)

After reviewing several of its own decisions and those of the Court of Appeal, the court summarized three "basic principles" regarding the standard of review for adequacy of an EIR: "(1) An agency has considerable discretion to decide the manner of the discussion of potentially significant effects in an EIR. (2) However, a reviewing court must determine whether the discussion of a potentially significant effect is sufficient or insufficient, i.e., whether the EIR comports with its intended function of including ' " 'detail sufficient to enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the proposed project.' " ' [Citation.] (3) The determination whether a discussion is sufficient is not solely a matter of discerning whether there is substantial evidence to support the agency's factual conclusions." (*Sierra Club*, *supra*, 6 Cal.5th at pp. 515–516.)

"The ultimate inquiry, as case law and the CEQA guidelines[2] make clear, is whether the EIR includes enough detail 'to enable those who did not participate in its

---

2 Subsequent references to "Guidelines" are to the CEQA guidelines found in title 14 of the California Code of Regulations, section 15000 et seq.

preparation to understand and to consider meaningfully the issues raised by the proposed project.' " ( *Sierra Club*, *supra*, 6 Cal.5th at p. 516.)  Generally, that inquiry is a mixed question of law and fact subject to de novo review, but to the extent factual questions (such as the agency's decision which methodologies to employ for analyzing an environmental effect) predominate, a substantial evidence standard of review will apply. (*Ibid*.)

Further, " '[i]n determining the adequacy of an EIR, the CEQA Guidelines look to whether the report provides decision makers with sufficient analysis to intelligently consider the environmental consequences of a project.  ([Guidelines,] § 15151.)  The CEQA Guidelines further provide that "the sufficiency of an EIR is to be reviewed in the light of what is reasonably feasible. . . . The courts have [therefore] looked not for perfection but for adequacy, completeness, and a good faith effort at full disclosure." ([Guidelines,] § 15151.)'  [Citation.]  The overriding issue on review is thus 'whether the [lead agency] reasonably and in good faith discussed [a project] in detail sufficient [to enable] the public to discern from the [EIR] the "analytic route the . . . agency traveled from evidence to action." ' " (*California Oak Foundation v. Regents of University of California* (2010) 188 Cal.App.4th 227, 262 (*California Oak Foundation*); see *Sierra Club, supra,* 6 Cal.5th at p. 515 ["We also affirm that in reviewing an EIR's discussion, we do not require technical perfection or scientific certainty . . . ."].)  "Although an agency's failure to disclose information called for by CEQA may be prejudicial 'regardless of whether a different outcome would have resulted if the public agency had complied' with the law (§ 21005, subd. (a)), under CEQA, 'there is no presumption that error is prejudicial' (§ 21005, subd. (b)).  Insubstantial or merely technical omissions are not grounds for relief.  [Citation.]  'A prejudicial abuse of discretion occurs if the failure to include relevant information precludes informed decisionmaking and informed public participation, thereby thwarting the statutory goals of the EIR process.' " (*Neighbors for Smart Rail v. Exposition Metro Line Construction Authority* (2013) 57 Cal.4th 439, 463; *id.* at pp. 464–465 [failure to comply with CEQA's informational mandate "did not

6

deprive agency decision makers or the public of substantial information relevant to approving the project, and is therefore not a ground for setting that decision aside"].)

With these principles in mind, we turn to the merits.

**B.** *Alleged CEQA Violations*

Plaintiffs assert numerous defects in the agency's CEQA review in this case.

### 1. Project Description

Plaintiffs first argue the EIR is inadequate because it failed to provide a stable, accurate project description. They contend because the DEIR presented two alternative schemes, the office scheme and residential scheme, it was "confusing" and hampered commenters' ability to understand which project was actually proposed and analyzed.

A draft EIR must include a project description. (*Washoe Meadows Community v. Department of Parks & Recreation* (2017) 17 Cal.App.5th 277, 287 (*Washoe Meadows*).) The project description must contain (1) the precise location and boundaries of the proposed project; (2) a statement of the objectives sought by the proposed project, including the underlying purpose; (3) a general description of the project's technical, economic, and environmental characteristics; and (4) a statement briefly describing the intended uses of the EIR. (Guidelines, § 15124.) The description should not, however, "supply extensive detail beyond that needed for evaluation and review of the environmental impact." (*Ibid.*) The description must include the entirety of the project, and not some smaller portion of it. (*San Joaquin Raptor Rescue Center v. County of Merced* (2007) 149 Cal.App.4th 645, 654 (*San Joaquin Raptor Rescue*).)

"[A]n accurate, stable and finite project description is the *sine qua non* of an informative and legally sufficient EIR." (*County of Inyo v. City of Los Angeles* (1977) 71 Cal.App.3d 185, 199 (*County of Inyo*).) "Only through an accurate view of the project may affected outsiders and public decision-makers balance the proposal's benefit against its environmental cost, consider mitigation measures, assess the advantage of terminating the proposal . . . and weigh other alternatives in the balance." (*Id.* at pp. 192–193.) A project description that gives conflicting signals to decision makers and the public about the nature of the project is fundamentally inadequate and misleading. (*San Joaquin*

7

*Raptor Rescue*, *supra*, 149 Cal.App.4th at pp. 655–656.) Further, "[a] curtailed, enigmatic or unstable project description draws a red herring across the path of public input." (*County of Inyo*, at p. 198.) "Whether an EIR correctly describes a project is a question of law, subject to de novo review." (*Rodeo Citizens Assn. v. County of Contra Costa* (2018) 22 Cal.App.5th 214, 219.)

Plaintiffs' claim that the DEIR presented "multiple possible Projects rather than a finite description of a single project" is specious. Plaintiffs do not dispute the DEIR's project description met CEQA technical requirements, and do not describe any information that was required to be included in the project description but was not. (See Guidelines, § 15124 [describing information that must be included in EIR].) Nor was the information provided in the DEIR confusing, as plaintiffs contend. The DEIR described the 5M Project generally as a mixed-use project on a four-acre site in downtown San Francisco. The office and residential schemes were "[t]wo project options (with substantially the same overall gross square footage but with a varying mix of residential and office uses)." Under both the office and residential schemes, the proposed project would involve (1) construction of new active ground floor space; (2) similar massing and land use except along Howard Street; and (3) retention and rehabilitation of the Chronicle and Dempster Printing Buildings, demolition of all other existing buildings on the site, and construction of four new buildings ranging in height from 195 to 470 feet. In text and table format, the DEIR set forth measurements of gross square footage for both schemes,[3] and included a table specifying the proposed uses and gross square footage for each building under both schemes. It presented site plans, illustrative massing, building elevations, cross-sections, and representative floor plans for both options. Further, the DEIR evaluated the environmental impacts of each scheme independently.

---

[3] The office scheme proposed a total of 1,827,000 gsf comprised of 871,900 gsf of office uses, 802,500 gsf of residential uses, 663 parking spaces, and 44,600 gsf of publicly accessible open space. The residential scheme would consist of 1,808,800 gsf, consisting of 598,500 gsf of office space, 1,057,700 gsf of residential uses, 756 parking spaces, and 62,100 gsf of open space.

Plaintiffs contend the agency's response to public comments regarding confusion over the two schemes was insufficient, because it stated in part that the project has similar square footage but with a varying mix of residential and office uses. The agency's response to public comments, however, was far more explicit. The Planning Department referenced tables in the DEIR providing a clear description of the proposed uses and corresponding square footage for each development option, with the key differences between the two schemes further explained on pages 41 through 44 of the DEIR. The agency noted the evaluation of environmental impacts in the DEIR focused on the office scheme because it "represents the largest development envelope" and the "more intensive" of the two schemes, resulting in a "conservative assessment of the [DEIR] Project's impacts." As the agency explained, the "analysis in the [DEIR] was intended to present the development program associated with both design options and to identify the associated environmental impacts and required mitigation measures side-by-side and in sufficient detail so that decision-makers would have the option of approving either of the development schemes as part of the overall project approval."

Thus, the record reveals the EIR in this case described one project—a mixed-use development involving the retention of two historic buildings, the demolition of all other buildings on the site, and the construction of four new buildings and active ground floor space—with two options for different allocations of residential and office units. The analysis was not curtailed, misleading, or inconsistent. If anything, it carefully articulated two possible variations and fully disclosed the maximum possible scope of the project. The project description here enhanced, rather than obscured, the information available to the public.[4]

_____

[4] Plaintiffs cite a comment from Planning Commissioner Kathrin Moore that a phased project could have been proposed, which is what occurs in a "normal" approval process. Commissioner Moore's comments, however, do not describe a deficiency in the EIR's project description, nor do they express any confusion over the proposed options for the office and residential schemes. Further, as the trial court noted, Commissioner Moore voted to certify the EIR.

9

Plaintiffs also complain the DEIR was inadequate because it did not include renderings showing the specific architectural detailing, "street level" views of the code compliant alternative, or perspectives of how the development would appear from surrounding neighborhoods.  They also argue the use of a "design for development" document and references to the proposed Fifth and Mission Special Use District delayed disclosure of important details about the project.[5]  But the EIR provided renderings showing the massing of the existing site, the proposed office and residential schemes, the revised project, and the alternative schemes, as well as views of the project site from various points in the city; plaintiffs generally fail to explain why those renderings were inadequate.[6]  Nor do plaintiffs explain how the absences of additional renderings, use of the design for development document, or discussion of the Special Use District concealed information that was crucial to a review of the environmental effects of the project, or how these purported defects impacted public participation.  In any event, when assessing the legal sufficiency of an EIR, we do not look for perfection, but "adequacy, completeness, and a good faith effort at full disclosure."  (Guidelines, § 15151; *Sierra Club, supra,* 6 Cal.5th at p. 515; *California Oak Foundation, supra,* 188 Cal.App.4th at p. 276 [alternatives discussion must be reasonably detailed but not exhaustive; key issue is whether discussion encourages informed decisionmaking and public participation].)  That standard was met here.

*County of Inyo, supra,* 71 Cal.App.3d 185, cited by plaintiffs in support of their argument, is distinguishable.  There, the City of Los Angeles had been ordered to prepare an EIR for a project involving pumping of groundwater for export from the Owens

---

[5]  This issue is also forfeited because plaintiffs have not shown it was raised during the administrative process.

[6] As to the code compliant alternative, plaintiffs state the axonometric (without perspective) drawing looking down on the site made it look misleadingly small.  They note their request for a complete study and presentation was denied, precluding their ability to assess the difference between the proposed scheme and the code compliant alternative.  It appears the code compliant alternative, however, was rendered in the same perspective as the other alternatives, including the preservation alternative, on which the revised project was based.  Plaintiffs do not explain how that makes comparison difficult.

Valley via two above-ground aqueducts, but the EIR as prepared had a much narrower description of the project as involving only the relatively small increase in pumping of water for unanticipated uses in Inyo and Mono Counties. (*Id.* at pp. 189, 195.) Moreover, throughout the EIR process, the project description varied, with the result that the "small-scale groundwater project described at the outset was dwarfed by the 'recommended project' ultimately endorsed" that dealt with "important, large-scale phases of the city aqueduct management program." (*Id.* at pp. 196–199.) The court concluded the agency's selection of a "narrow project as the launching pad for a vastly wider proposal frustrated CEQA's public information aims." (*Id.* at pp. 199–200.) Here, there were no similar fluctuations in the project description during the EIR process, nor is the initial project description a misleadingly small fragment of the ultimately approved project.

Plaintiffs' reliance on *Washoe Meadows, supra,* 17 Cal.App.5th 277, is also misplaced. In that case, the draft EIR identified five "very different" alternatives as potential projects. (*Id.* at p. 281.) Critically, the draft EIR did not identify a preferred or proposed project *at all*, but indicated it would determine "which alternative or combinations of features from multiple alternatives" would become the preferred alternative *after* receiving public comments. (*Id.* at p. 283.) As our colleagues in Division Five explained, "[w]hile there may be situations in which the presentation of a small number of closely related alternatives would not present an undue burden on members of the public wishing to participate in the CEQA process, in this case the differences between the five alternative projects was vast, each creating a different footprint on public land. Each option created a different set of impacts, requiring different mitigation measures. . . . [¶] . . . The [draft EIR] in this case was not simply lacking in details that could not be reasonably supplied as yet; rather, it failed to identify the project being proposed." (*Id.* at pp. 288–289, fn. omitted.) In this case, by contrast, the project description clearly identified a mixed-use development project at a specific, defined location with two options for allocations of office and residential use.

Plaintiffs also complain that the FEIR adopted a proposed plan based on neither the office scheme nor the residential scheme, but a "revised" project that was a variant of the preservation alternative identified in the DEIR. They fail, however, to identify any component of the revised project that was not addressed in the DEIR or subject to public comment. Further, "[t]he CEQA reporting process is not designed to freeze the ultimate proposal in the precise mold of the initial project; indeed, new and unforeseen insights may emerge during investigation, evoking revision of the original proposal." (*County of Inyo, supra,* 71 Cal.App.3d at p. 199.) The whole point of requiring evaluation of alternatives in the DEIR is to allow thoughtful consideration and public participation regarding other options that may be less harmful to the environment. (*San Franciscans Upholding the Downtown Plan v. City and County of San Francisco* (2002) 102 Cal.App.4th 656, 695 [CEQA's purpose is to encourage project sponsors to consider and adopt "*feasible* alternatives and mitigation measures. . . . to lessen or avoid adverse environmental impacts"].) "CEQA does not handcuff decisionmakers . . . . The action approved need not be a blanket approval of the entire project initially described in the EIR. If that were the case, the informational value of the document would be sacrificed. Decisionmakers should have the flexibility to implement that portion of a project which satisfies their environmental concerns." (*Dusek v. Redevelopment Agency* (1985) 173 Cal.App.3d 1029, 1041 (*Dusek*).)[7] We do not conclude the project description is inadequate because the ultimate approval adopted characteristics of one of the proposed alternatives; that in fact, is one of the key purposes of the CEQA process.

In sum, we conclude the project description was adequate under CEQA.

### 2. Cumulative Impacts

Cumulative impacts are "two or more individual effects which, when considered together, are considerable or which compound or increase other environmental impacts."

---

[7] Plaintiffs argue *Dusek* is factually distinguishable from this case, but do not explain why the legal principle that decision makers should have flexibility to adopt portions of a project (or environmentally superior alternative) to address environmental concerns does not apply.

12

(Guidelines, § 15355.) An adequate discussion of significant cumulative impacts may be based *either* on a list of "past, present, and probable future projects producing related or cumulative impacts," or "[a] summary of projections contained in an adopted local, regional or statewide plan, or related planning document, that describes or evaluates conditions contributing to the cumulative impact." (Guidelines, § 15130, subd. (b)(1)(A)–(B).)

Plaintiffs argue the EIR used an outdated 2012 project list that was developed during the Great Recession to analyze the cumulative impact of probable future projects. They point to two comments made during the review process that in the years since 2012, San Francisco " 'has been subjected to a tremendous uptick in development pressure and applications to increase the development potential of property in the vicinity of the Project Site' " and " 'obviously development is rampant right now,' " to argue the 2012 project list is no longer reflective of current conditions and is not an accurate baseline for fair assessment of the project's cumulative impacts.

Apart from general observations that development is " 'rampant' " and there has been " 'a tremendous uptick in development pressure' " in San Francisco, however, plaintiffs point to no evidence in the record that the Great Recession rendered the project list defective or misleading, or that the City ignored "projects that were in the pipeline for the purpose of adjudging cumulative impacts." The DEIR included 17 projects for which the Planning Department had received environmental evaluation or similar applications in the project vicinity. Though plaintiffs cite one comment from SOMCAN's director that the City failed to account for "major projects" including the Mexican Museum Tower, the San Francisco Museum of Modern Art (SFMOMA) expansion, the Moscone Convention Center expansion, and the Transit Center District Plan in the EIR, the record reflects each of those projects was included in the analysis of cumulative traffic impacts.[8] Moreover, for the traffic and circulation analysis, the City used *two* methodologies: (1) a "summary

---

[8] The SFMOMA Expansion Project, Mexican Museum, and Moscone Center Expansion Project were also listed as reasonably foreseeable projects within the vicinity of the site in the DEIR project description.

13

of projections approach," that relied on the San Francisco County Transportation Authority's (SFCTA) San Francisco Chained Activity Modeling Process (SF-CHAMP) model to analyze anticipated growth and cumulative traffic and circulation impacts through the year 2040, which it then "refined and validated" with (2) a "list-based approach."  It is well established an agency has discretion in selecting the methodology to be used in evaluating environmental impact, subject to review for substantial evidence.  (See *Sierra Club, supra,* 6 Cal.5th at p. 514.)  Plaintiffs have not shown the City's choice of methodologies was unsupported by substantial evidence.

Nor is plaintiffs' claim the City should not have relied on a project list from 2012 persuasive.  Indeed, plaintiffs concede that physical conditions existing when the notice of preparation is published normally are used to establish the baseline for cumulative impacts.  (Guidelines, § 15125, subd. (a)(1).)  The DEIR was issued in January 2013. The City had discretion to determine a reasonable date as a cutoff for which projects to include in the cumulative impacts analysis, and plaintiffs have not shown the City's decision to use a 2012 project list was unsupported by substantial evidence.  (See, e.g., *Communities for a Better Environment v. South Coast Air Quality Management Dist.* (2010) 48 Cal.4th 310, 328 [agency has discretion to determine existing conditions baseline, subject to review for substantial evidence]; *Gray v. County of Madera* (2008) 167 Cal.App.4th 1099, 1128 [county had discretion to set date of application for current project as cutoff date for deciding which projects to include in cumulative impacts analysis].)  Further, though the list of projects was first obtained in 2012, the City reviewed the list prior to publication of the DEIR to verify it remained representative of past, present, and reasonably foreseeable probable future projects.[9]  Plaintiffs do not cite

[9] Plaintiffs also claim the City's reliance on *data* from the Draft Central SOMA Plan EIR for the 5M Project cumulative impacts analysis was improper "because it constituted deferral of analysis to a future plan."  Plaintiffs do not explain this conclusory contention, nor is it supported by the authority they cite.  *Sundstrom v. County of Mendocino* (1988) 202 Cal.App.3d 296 involved a negative declaration rather than an EIR, and discussed improper deferral of mitigation measures, not use of data from a draft EIR in a cumulative impacts analysis.  (*Id.* at pp. 306–307.)  Plaintiffs cite no authority

14

any evidence in support of their claim "up-to-date data" was excluded from the cumulative impacts analysis.

Plaintiffs also claim the EIR "artificially constrained the study area" to only include future projects in the vicinity of the site, rather than the entire downtown area. An agency's selection of the geographic area impacted by a proposed development, however, falls within the lead agency's discretion, based on its expertise. (Guidelines, § 15130, subd. (b)(3); *City of Long Beach v. Los Angeles Unified School Dist.* (2009) 176 Cal.App.4th 889, 907 (*City of Long Beach*).) Moreover, discussion of cumulative impacts in an EIR " 'should be guided by the standards of practically and reasonableness.' " (*City of Long Beach,* at p. 912.) Absent a showing of arbitrary action, a reviewing court must assume the agency has exercised its discretion appropriately. (*Id.* at p. 908.) Though a court may reject a study area if it is " 'so narrowly defined that it necessarily eliminates a portion of the affected environmental setting,' " no such circumstances were shown here. (*Id.* at p. 907.) Plaintiffs point to nothing in the record showing the study area as defined in the EIR excluded a portion of the affected setting or that studying the entire "downtown area" would have altered the City's analysis of environmental impacts.

*San Franciscans for Reasonable Growth v. City and County of San Francisco* (1984) 151 Cal.App.3d 61, relied on by plaintiffs, is inapposite. In that case, the city simultaneously pursued four downtown high-rise projects and produced EIR's for each project that unlawfully ignored the likely impacts of the other three. (*Id.* at pp. 67–68, 74–75, 80–81.) The court concluded that by leaving out "closely related projects that were currently under environmental review, the Commission applied an unreasonably narrow interpretation of the Guidelines, and in so doing, abused its discretion." (*Id.* at

---

that a lead agency may rely only on data from a completed EIR, and in fact, such a rule would be counterproductive to the purpose of CEQA in ensuring a thorough review of all reasonably foreseeable probable impacts. We also find this contention somewhat puzzling in light of plaintiffs' argument the EIR was inadequate for failing to identify inconsistencies with the Draft Central SoMa Plan, a claim we further discuss below.

15

p. 74, fn. omitted.)  Here, as discussed above, plaintiffs do not identify closely related, foreseeable projects that were actually excluded from the EIR's cumulative impacts analysis.

Plaintiffs also assert the EIR neither discussed nor analyzed the number of gross square feet per office worker of foreseeable additional or modified office development and used an "old" methodology for calculating project density, thereby undercounting the number of office workers in the cumulative impacts analysis.  The EIR explained, however, that the City relied on a report by its consultant, Economic & Planning Systems, projecting densities between 160 and 275 square feet per employee, with an average density of 210 square feet per employee, a higher density than often assumed for conventional commercial space, which is about 250 square feet per employee.  For cumulative traffic impacts, the City used the SF-CHAMP model inputs for future growth which were "developed using a square footage per office worker of 200 square feet per employee based on Planning Department information on employee density trends."  The City was entitled to rely on its own experts and consultants, and the record reveals the density calculations were supported by substantial evidence.  (See *Association of Irritated Residents v. County of Madera* (2003) 107 Cal.App.4th 1383, 1397; *Ukiah Citizens for Safety First v. City of Ukiah* (2016) 248 Cal.App.4th 256, 261 [substantial evidence standard of review applies to methodology used for studying an impact].)

Plaintiffs also contend the project would result in density-related cumulative impacts because it did not include a stepdown transition for building heights as proposed in the Central SoMa Plan.  Plaintiffs forfeited this argument by raising it for the first time on appeal.[10]  In any event, as the EIR explained, the 5M Project is not subject to the Central SoMa Plan.

_____

[10] On reply, plaintiffs argue they raised the issue in their opening brief in the trial court by "referenc[ing] the letter from SoMa concerning the lack of a step-down transition area."  The letter they reference is one of a string of citations to the administrative record in support of the general argument that "The EIR fails to adequately analyze cumulative impacts as noted in the DEIR comment letters by attorneys Eric Phillips and Susan Brandt-Hawley and by Save our SoMa, South of

16

Plaintiffs further claim that it is unclear whether population projections cited in the EIR were actually applied to the cumulative traffic impacts analysis and whether a memorandum on "Population and Employment Projections for the 5M Development" from Michael Nimon and Tepa Banda to Forest City was used in the DEIR to assess cumulative traffic impacts.  But the record shows that the cumulative traffic impacts analysis relied on the SF-CHAMP model, which incorporates, among other things, population, housing units, and employment growth assumptions developed by the Association of Bay Area Governments (ABAG) and under the City's General Plan.  Plaintiffs further assert the information cited in the Nimon/Banda memorandum should have been included in the body of the EIR and not buried in an appendix or some other document referenced but not included in the EIR.  But the Nimon/Banda memorandum was discussed in the DEIR in the project description, and its projected employee and resident counts were set forth in the body of the DEIR.  Further, the DEIR noted the document was available for review at the Planning Department.  (Guidelines, § 15150, subd. (a) [EIR may incorporate publicly available documents by reference].)  The cases relied on by plaintiffs are distinguishable, as they involved circumstances in which the EIR entirely omitted critical information or made it very difficult to find.  (See *Vineyard Area Citizens for Responsible Growth v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 442 [county could not rely on information not actually incorporated or described and referenced in the EIR]; *San Joaquin Raptor Rescue*, *supra*, 149 Cal.App.4th at p. 659 [EIR should not force public and decision makers to "sift through obscure minutiae or appendices" to determine the "fundamental baseline assumptions" used for the environmental analysis]; *California Oak Foundation v. City of Santa Clarita* (2005) 133 Cal.App.4th 1219, 1239–1240 [critical information was added to EIR shortly before certification and appeared only in an appendix with inadequate facts and analysis].)

Market Community Action Network and San Franciscans for Reasonable Growth."  It hardly merits mention that a record citation, standing alone, does not suffice to raise a legal or factual issue.

17

In sum, plaintiffs have failed to show the EIR was deficient for failing to properly consider the project's cumulative impacts.

### 3. Traffic and Circulation Impacts

Plaintiffs next argue the EIR failed to adequately consider traffic and circulation impacts from the proposed project. Specifically, plaintiffs argue the City failed to (1) include intersections adjacent to impacted ones in its analysis of potentially significant impacts, (2) consider the impact of the Safer Market Street Plan, and (3) adequately identify or discuss specific mitigation measures and evaluate community-proposed alternatives.

#### a. Adjacent Intersections

Plaintiffs argue the EIR failed to adequately analyze traffic impacts by using an artificially small study area to avoid review of potentially significant impacts. They contend existing traffic conditions will be made worse with the proposed project, and the EIR failed to review the traffic impacts at intersections adjacent to the project development area and the Interstate 280 on- and off-ramps. After oral argument, we asked the parties for additional briefing on the effect, if any, of the Supreme Court's recent *Sierra Club* decision on plaintiffs' argument that the EIR failed to adequately consider direct traffic and circulation impacts due to use of an artificially small study area that avoided review of impacted intersections.

As discussed above with respect to cumulative impacts, the agency's selection of the geographic area impacted by a proposed development falls within the lead agency's discretion, and " ' "[a]bsent a showing of arbitrary action, we must assume that the agencies have exercised this discretion appropriately." ' " (*City of Long Beach, supra*, 176 Cal.App.4th at p. 908; Guidelines, § 15130, subd. (b)(3); *Ebbetts Pass Forest Watch v. Department of Forestry & Fire Protection* (2004) 123 Cal.App.4th 1331, 1351–1353.) In *City of Long Beach,* the lead agency narrowed an initial list of 79 projects down to 11 projects for the study area, based on their proximity to the project site and potential to contribute to traffic volume on surface streets in the area. (*Id.* at p. 909.) The court concluded this was an appropriate exercise of discretion. (*Ibid.*)

As in *City of Long Beach,* plaintiffs have failed to demonstrate an abuse of discretion in the City's selection of intersections to analyze for traffic impacts. The DEIR set forth detailed significance criteria and an analytical methodology for determining adverse traffic and circulation impacts, none of which plaintiffs specifically challenge.[11] The City selected 21 study intersections "in the vicinity of the project site because they would capture the relative change in levels of service that could be associated with the project. Project-generated traffic would access and exit the site from the surrounding street network and the study intersections are those most likely to accommodate project trips." These were similar to the considerations employed to determine the study area in *City of Long Beach,* and as there, the determination of the appropriate traffic study area was not " ' "arbitrary," ' " nor was it " 'so narrowly defined that it necessarily eliminates a portion of the affected environmental setting.' " (*City of Long Beach, supra,* 176 Cal.App.4th at pp. 907–908.)

Plaintiffs contend generally that "[t]he area is well known to be severely congested with traffic" and argue the traffic and circulation analysis "failed to fully disclose the Project's direct traffic impacts" to other intersections outside the study area. In support of this argument, they cite approximately a dozen general comments about how bad traffic is in the project vicinity and at intersections studied in the EIR. Apart from quoting one specific public comment,[12] plaintiffs do not specifically identify the

---

[11] In their supplemental brief, plaintiffs assert the FEIR failed to divulge what criteria were used by the Planning Department, precluding their ability to evaluate the efficacy of that selection. Plaintiffs did not raise this issue in their briefs or at oral argument. In any event, it lacks merit, because the DEIR disclosed both the significance criteria and analytical methodology used for the traffic analysis.

[12] One public comment (repeated verbatim by several commenters) stated the DEIR failed to analyze impacts to the intersection of Third and Howard Streets, impacts to Seventh Street along Folsom Street, Bryant Street or Brannan Street, and impacts to the on- and off-ramps near Interstate 280. With respect to the intersection of Third and Howard Streets, the City conducted an additional study of traffic impacts following the public comment period. The study concluded there was no significant impact at that intersection. With respect to Seventh Street, the FEIR explained it was not a primary access route to or from the project. And with respect to Interstate 280 ramps, the FEIR

purportedly impacted intersections outside the study area that they argue should have been included. Further, plaintiffs' argument that adjacent intersections should have been included in the study area challenges the City's method for conducting its traffic analysis, not the adequacy of its discussion of traffic impacts in the EIR. (See, e.g., *Sierra Club, supra,* 6 Cal.5th at p. 514 [substantial evidence review applies to challenges to methodology used for studying an impact, as opposed to question whether discussion of environmental impact in EIR is conclusory, which is subject to de novo review]; *City of Long Beach, supra,* 176 Cal.App.4th at p. 898 [substantial evidence test applies to challenges to methodology].)

In any event, the FEIR explained why additional intersections were not included: "The intersections included for analysis of the [DEIR] Project's traffic impacts were identified based on criteria developed by the Planning Department, and represent a reasonable representation of the probable impacts of the [DEIR] (and Revised Project). Further from the project site, traffic is dispersed among numerous streets and the project vehicle contributions to the intersections further away are decreased. The intersections selected for analysis include the intersections adjacent to the project site, the intersections used for access to and from the Fifth and Mission Garage, and key intersections to the south providing access to and from the nearby [Interstate] 80 and [Interstate] 280 freeways (the study intersection of Sixth/Brannan includes the [Interstate] 80 ramp operations). Seventh Street would not serve as a primary access route to or from the project site because Fourth, Fifth, and Sixth Streets provide more direct access to the project site and the nearby Fifth and Mission Garage." Though plaintiffs argue it was reasonably feasible to include analysis of a larger geographic area, our courts have repeatedly emphasized that an EIR must demonstrate a good faith effort at full disclosure; it does not require perfection, nor exhaustive analysis. (See *Sierra Club*, *supra*, 6 Cal.5th at p. 515 [courts look for " ' " 'adequacy, completeness and a good-faith effort at full

explained that the Sixth and Brannan study intersection includes the Interstate 280 ramp operations.

20

disclosure' " ' "]; *Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 415 ["A project opponent or reviewing court can always imagine some additional study or analysis that might provide helpful information. It is not for them to design the EIR. That further study . . . might be helpful does not make it necessary."].) On this record, we cannot conclude the City abused its discretion by failing to consider the traffic impact on additional intersections.[13]

### b. *Safer Market Street Plan*

Plaintiffs also complain the City did not evaluate the significance of the Safer Market Street Plan (SMSP) in the EIR. An EIR must consider conditions that are present, or reasonably foreseeable, as of publication of the notice of preparation (NOP). (Guidelines, § 15125, subd. (a)(1).) The NOP for the 5M Project was published in January 2013. The SMSP was approved two and a half years later, in June 2015. Plaintiffs cite no evidence the SMSP was a " 'probable future project[]' " when the NOP was published. (*Gray v. County of Madera*, *supra*, 167 Cal.App.4th 1099, 1127 ["[M]ere awareness of proposed expansion plans or other proposed development does not

---

[13] Plaintiffs also rely on *Bozung v. Local Agency Formation Com.* (1975) 13 Cal.3d 263, *City of Livermore v. Local Agency Formation Com.* (1986) 184 Cal.App.3d 531, and *City of Antioch v. City Council* (1986) 187 Cal.App.3d 1325 for the principle that an agency may not limit a study area to avoid review of potentially significant impacts. But those cases involved whether an EIR should have been prepared at all, not an agency's purported abuse of discretion in defining the geographic study area in an EIR. Nor are we required to consider plaintiffs' citation to *Protect the Historic Amador Waterways v. Amador Water Agency* (2004) 116 Cal.App.4th 1099, 1109 (*Protect Waterways*), which they cite for the first time in their reply brief. (See *In re Groundwater Cases* (2007) 154 Cal.App.4th 659, 693 [court ordinarily will not consider issues raised for the first time on reply].) In any event, *Protect Waterways* is distinguishable. There, the EIR was inadequate because it failed to explain the agency's conclusion that a reduction in stream flows was an insignificant environmental impact, relying only on a threshold of significance from the CEQA Guidelines which the plaintiff argued was inadequate because it did not address reduction in stream flows. (*Protect Waterways*, at p. 1111.) Here, by contrast, the EIR analyzed traffic impacts under its significance criteria and project methodology (which plaintiffs did not challenge), explained its findings under those criteria, and explained why it did not consider additional intersections in response to plaintiffs' comments.

necessarily require the inclusion of those proposed projects in the EIR. Rather, these proposed projects must become 'probable future projects.' "]; *City of Maywood v. Los Angeles Unified School Dist.* (2012) 208 Cal.App.4th 362, 397–398 (*City of Maywood*).) Further, plaintiffs point to no evidence in the record to indicate the SMSP would have any adverse impact on traffic and circulation related to the 5M Project. In support of their contention it was "generally known" the SMSP would cause more traffic, plaintiffs cite to letters from citizens' groups, which in turn, fail to cite any traffic studies or similar evidence. On this record, we cannot conclude the agency's failure to consider the SMSP in the EIR was an abuse of discretion.

### c. Mitigation Measures

Plaintiffs next complain the City failed to consider particular mitigation measures including: (1) reducing the amount of trip-generating uses, (2) providing funds to enhance public transportation service in the area, (3) implementing a transportation demand management (TDM) plan that is specific to the project, or (4) reviewing alternatives suggested by plaintiffs to reduce the amount of traffic generated by the 5M Project. The record reflects otherwise.

The DEIR determined that both the office and residential schemes of the proposed 5M Project would cause significant and unavoidable cumulative impacts at nine intersections. In the impact analysis of the identified project alternatives, the DEIR analyzed the potential for reducing traffic impacts at intersections by reducing the amount of trip-generating uses. Specifically, the DEIR concluded three of the feasible alternatives explored would generate fewer vehicle trips during the peak weekday hour than the proposed project, which would produce 730 vehicle trips under the office scheme and 705 vehicle trips under the residential scheme. The code compliant alternative would generate 417 vehicle trips, the unified zoning alternative would generate 489 vehicle trips, and the preservation alternative would generate 548 vehicle trips. As adopted, the revised project described in the FEIR, which was largely based on the preservation alternative, further reduced the number of vehicle trips during the peak weekday hour to 465 vehicle trips from the 548 identified in the preservation alternative.

22

The revised project also reduced the cumulative impacts at three intersections to a less-than-significant level; thus reducing the total number of significant and unavoidable cumulative impacts from nine to six intersections between the DEIR and the FEIR.

The DEIR also considered requiring the developers to contribute funds to public transportation, but rejected the option because the project did not result in significant transit impacts and the project area was already well served by public transit, with available capacity to accommodate the additional transit trips generated by the project. The City also noted, "Because of the availability of both local and regional transit routes in the project vicinity with available capacity, a substantial increase in transit service would be needed to shift mode of travel from auto to transit. In addition, providing additional funds for transit is not usually considered a feasible mitigation measure in San Francisco, the ability of the SFMTA [(San Francisco Municipal Transportation Agency)] and/or regional transit operators to provide additional transit vehicles and operators needed to reduce transit impacts to less than significant levels is uncertain," and the City already imposes "transit-related exactions through its exiting Transit Impact Development Fee."

Contrary to plaintiffs' contentions the EIR also addressed a TDM plan. The EIR identified a TDM plan as a potential mitigation measure, and noted while it was not required, the developer included one as part of the revised project and as part of the development agreement. Further, the FEIR specifically discusses the TDM plan's goal to reduce the number of vehicle trips generated by the proposed project by 20 percent, belying plaintiffs' claim it only addressed impacts in the context of air quality.

Finally, we reject plaintiffs' claim the City was required to evaluate the "Community" and "Zero-Parking" alternatives. "CEQA does not require that an agency consider specific alternatives that are proposed by members of the public or other outside agencies." (*City of Maywood, supra,* 208 Cal.App.4th at p. 420; *California Native Plant Society v. City of Santa Cruz* (2009) 177 Cal.App.4th 957, 999 ["potentially feasible alternatives 'are suggestions which may or may not be adopted by the decisionmakers' "].) Rather, the City was responsible for selecting a range of project

23

alternatives that could feasibly accomplish most of the basic objectives of the project and could avoid or lessen one or more of its significant impacts. (Guidelines, § 15126.6.) "The range of alternatives required in an EIR is governed by a 'rule of reason' that requires the EIR to set forth only those alternatives necessary to permit a reasoned choice." (Guidelines, § 15126.6, subd. (f); see *Village Laguna of Laguna Beach, Inc. v. Board of Supervisors* (1982) 134 Cal.App.3d 1022, 1029 [EIR need not " 'consider in detail each and every conceivable variation of the alternatives stated' "].)

Courts will defer to an agency's selection of alternatives unless the petitioners (1) demonstrate that the chosen alternatives are " ' "manifestly unreasonable and . . . do not contribute to a reasonable range of alternatives," ' " and (2) submit evidence showing the rejected alternative was both "feasible" and "adequate," because it was capable of attaining most of the basic objectives of the project, taking into account site suitability, economic viability, availability of infrastructure, general plan consistency, and other relevant factors. (*Center for Biological Diversity v. Department of Fish & Wildlife* (2015) 234 Cal.App.4th 214, 256; Guidelines, § 15126.6, subd. (f); *City of Maywood, supra,* 208 Cal.App.4th at pp. 421–422.) Here, plaintiffs do not show the nine alternatives evaluated in the EIR were manifestly unreasonable.

Moreover, while they argue the City unreasonably failed to consider their proposed "Community" and "Zero-Parking" alternatives, plaintiffs did not meet their burden to show those alternatives were feasible and adequate because they were capable of attaining most of the basic objectives of the project. The proponents of the "Community Preferred Project Alternative" submitted only general descriptions of the proposed alternative, and did not provide any renderings of the proposed project until after certification of the EIR. Moreover, as Forest City notes, the proponents of the community alternative also noted it was substantially similar to the code compliant alternative proposed in the DEIR with respect to reducing the number of intersections with significant traffic impacts (as well as other proposed mitigation measures). The City declined to separately analyze the community alternative, noting (1) the proponents failed to "specify the overall development program . . . or how these elements would be

24

achieved," (2) the alternative was similar to those already considered in the DEIR, and (3) it was not clear the alternative could meet the basic objectives of the 5M Project. Plaintiffs have failed to establish the City abused its discretion in refusing to consider the community alternative. (See *Bay Area Citizens v. Association of Bay Area Governments* (2016) 248 Cal.App.4th 966, 1018–1019 [agency did not abuse discretion by refusing to consider alternative proposed by citizens group]; *California Native Plant Society v. City of Santa Cruz, supra,* 177 Cal.App.4th at p. 995 [sufficient evidence in administrative record as a whole supported agency's decision concerning which alternatives to analyze and which to omit].)

With respect to the zero-parking alternative, plaintiffs likewise fail to cite any evidence it was a feasible, adequate alternative that could meet the objectives of the 5M Project. The City considered nine alternatives to the 5M Project, including a "No Project" and an "Off-site" alternative, both of which would have contributed no traffic or additional parking spaces to the area, but which were rejected for failure to meet the objectives of the development program. Plaintiffs fail to explain how their zero-parking proposal would have fared better.

### 4. Wind Impacts

Plaintiffs raise several complaints with respect to the EIR's analysis of wind impacts resulting from the 5M Project. First, they argue the EIR inappropriately compares the revised project to the office and residential schemes initially proposed, rather than to existing conditions as required by CEQA. Second, they complain the revised project failed to comply with San Francisco Planning Code section 148, which requires an applicant for a project exceeding particular wind effect limits to show that the building could not be designed to avoid the exceedance or that redesign would unduly restrict the development potential. Third, they complain the EIR inappropriately relies on "wind baffling measures" in the design for development document to address wind impacts, in contravention of CEQA Guidelines requiring mitigation measures be addressed directly in the EIR and not left to future determination.

25

As an initial matter, we find these arguments were waived by failure to raise them during the administrative process. (*Sierra Club v. City of Orange* (2008) 163 Cal.App.4th 523, 535 [under exhaustion of administrative remedies doctrine, the " ' "exact issue" ' " must be presented to agency].) Though plaintiffs note commenters raised concerns regarding wind impacts during the public comment period, the remarks reflected general concerns about the amount of wind generated by the 5M Project, "wind tunnel" effects, and requests for mitigation measures. Such general comments are insufficient to raise the specific issues plaintiffs assert on appeal. (See *North Coast Rivers Alliance v. Marin Municipal Water Dist. Bd. of Directors* (2013) 216 Cal.App.4th 614, 631 [letters that failed to apprise agency of any specific inconsistencies with policies or programs in countywide plan did not give agency opportunity to evaluate and respond to alleged CEQA violation].)

Even if the arguments had been adequately raised, however, they fail on the merits. Plaintiffs' complaint that that revised project must be compared to existing conditions as opposed to the schemes proposed in the DEIR is addressed in the passage they quote at length from the FEIR.[14] Though the FEIR discusses improvements in wind

---

[14] Plaintiffs quote the following excerpt from the FEIR regarding the project's wind impacts: "Compared to the Draft EIR Project, wind conditions at the project site would vary slightly and the intensity of wind impacts would be less under the Revised Project given that the 195-foot-tall Building N-2 would not be developed, which would allow for an overall reduction in building heights and mass within the interior of the site. Under existing conditions, the Draft EIR identified 31 locations (out of 78 evaluated locations) that have wind speeds that exceed the pedestrian comfort criterion of winds greater than 11 miles per hour (mph) more than 10 percent of the time. The Draft EIR Project's Office Scheme would change wind patterns such that new exceedances would occur at 32 locations (Draft EIR page 478). As shown in **Figure RTC II-9**,[fn. omitted] compared to existing conditions, the Revised Project would result in 43 total exceedances, or 20 new exceedances compared to existing conditions and nine fewer exceedances than the Draft EIR project. Overall, the Revised Project would increase the average wind speed at test locations from 12 mph to 12.8 mph, a modest increase and less of an increase than the 2 mph increase identified for the Draft EIR Project. The highest wind speed (22 mph) would occur at the southwest corner of Fifth and Tehama Streets (Location 6), an increase from 17 mph under existing conditions. The 11 mph comfort criterion would be exceeded 17.4 percent of the time (compared to 14 percent of the time

impacts under the revised project compared with the DEIR office scheme, it also specifically compares wind impacts to existing conditions.

We also reject plaintiffs' argument that Forest City was required to prove that an alternative configuration of the project was infeasible under San Francisco Planning Code section 148. Section 148 establishes a hazard criterion for wind speed impacts, which is a 26-mile-per-hour (mph) wind speed for a single hour of the year, as well as a comfort criterion, which is an 11-mph wind speed for 10 percent of the year between the hours of 7:00 a.m. and 6:00 p.m. (S.F. Planning Code, § 148.) The City used the 26-mph hazard criterion to determine significant effects on wind patterns pursuant to CEQA. The record reflects the revised project *substantially reduced* exceedances over the "hazard" threshold when compared with existing conditions.[15] Plaintiffs do not assert the CEQA significance threshold established by the City was inappropriate, nor argue the City's determination of no significant wind impact was unsupported by substantial evidence. Indeed, the technical results described in the EIR constituted substantial evidence not contradicted by any other evidence in the record.

Rather than discuss the CEQA significance criterion for wind impacts, plaintiffs instead point to the EIR's discussion of exceedances of the 11-mph "comfort" threshold established by San Francisco Planning Code section 148. As the DEIR explains, the comfort criterion is "to be used in the evaluation of proposed buildings," but in the CEQA context, "these comfort criteria are compared to a project's anticipated wind speeds *for informational purposes, not to identify significant effects.*" (Italics added.) Because exceedances of the comfort criterion did not establish significant impacts for CEQA purposes, the City was not required to propose mitigation measures to address

under existing conditions or the 21 percent increase identified for the Draft EIR Project). Similar to the Draft EIR Project, the Revised Project would result in a relatively modest worsening of wind comfort conditions."

[15] Under existing conditions, the three locations with wind speeds over the hazard criterion did so for 79 hours a year, while under the revised project, exceedances of the hazard threshold would occur for a total of 4 hours per year (a reduction of 75 hours compared to *existing* conditions).

them.  (§ 21100, subd. (b)(3); Guidelines, § 15126.4, subd. (a)(1)(A) [EIR shall identify mitigation measures for each significant environmental effect identified in EIR]; *San Franciscans for Reasonable Growth v. City and County of San Francisco* (1989) 209 Cal.App.3d 1502, 1517; *Napa Citizens for Honest Government v. Napa County Bd. of Supervisors* (2001) 91 Cal.App.4th 342, 360 [once significant effect has been identified, EIR must propose mitigation measures].)  Accordingly, we reject plaintiffs' contentions that the City was required to show the building could not be redesigned to address the comfort exceedances and that the reference to wind baffling measures in the design for development document was an inadequate description of a proposed mitigation measure.

### 5.  Open Space

Plaintiffs also argue the project failed to provide adequate onsite open space.  In particular, they emphasize that the San Francisco Park Recreation and Open Space Advisory Committee expressed concern about the lack of a formal presentation on open space and passed a resolution requesting the Board postpone the hearing on the Project for further studies to be conducted.  Further, citizens complained about the lack of sunlight/presence of shadow in the planned spaces, exposure to mechanical room noise and air return, and lack of landscape drawings or plant lists for the open spaces.  Citizens and SOMCAN also noted the open space provided on top of the Chronicle Building accounts for half the open space provided by the project but is only accessible by elevator, and is therefore "substandard" and not "the best option to have sort of equitable open space."

In response to public comments, the EIR noted the 5M Project provides more open space than the San Francisco Planning Code requires,[16] and will result in less-than-significant environmental impacts related to demand on existing parks and open spaces.  Plaintiffs complain generally that the open space provided in the project is "inadequate

---

[16] The San Francisco Planning Code would require approximately 33,600 gsf of open space for the revised project, whereas 59,450 gsf would be provided.  Further, the revised project would meet the required square footage without the rooftop space.

28

and fails to provide asserted benefits," but they do not explain how these deficiencies *violate CEQA* or cite any legal authority in support of their argument. Thus, we reject this contention. (Cal. Rules of Court, rule 8.204(a)(1)(B); *Murphy v. Murphy* (2008) 164 Cal.App.4th 376, 405–406 [failure to cite pertinent legal authority is grounds for appellate court to reject party's argument].)

### 6. Shade and Shadow Impacts

Plaintiffs contend the EIR is inadequate with respect to the 5M Project's impacts to shade and shadow at two places in San Francisco—Boeddeker Park and Yerba Buena Gardens. As to both locations, plaintiffs contend the City failed to proceed in the manner required by law when it adopted an EIR that failed to disclose shadow impacts, failed to propose adequate mitigation, and failed to consider feasible alternatives.

Regarding Boeddeker Park, plaintiffs argue the 5M Project will increase the absolute and cumulative shadow limits and the City's decision to raise the threshold for those limits rather than considering an alternative configuration is "almost" without precedent for a for-profit development. They point to various comments that the shade and shadow increase will fall on the park's vegetable and flower garden. They also argue that when it was found the 5M Project would violate City policy mandating " 'no net new shadow,' " mitigation measures or alternatives should have been considered before considering the benefits of the project.

Under the significance criteria for shadow impact in the EIR, a shadow has a significant effect if it "substantially affects outdoor recreation facilities or other public areas." Plaintiffs do not challenge that standard for significance nor the City's authority to establish it. (See Guidelines, § 15064, subd. (b).) In the DEIR, the City explained in detail the new shadow impacts that would result in Boeddeker Park as a result of the project, and why they did not meet that significance threshold: "Under existing conditions, Boeddeker Park is shaded about 41.59 percent of the time. (Shadow cast under existing conditions and project conditions was calculated in the quantitative study conducted, consistent with the protocols Section 295 analysis.) The Office Scheme would shade Boeddeker Park only in the early morning hours during the winter months,

29

generally between October 25 and November 29, as well as between January 11 and February 15, when the sun is at a low angle and extensive shadows are cast by buildings in and around Downtown San Francisco.  The Office Scheme would not cast shadow during other times of the year, including the spring, summer, and fall.  On the worst-case shadow days, November 8 and February 1, a maximum of 742 square feet of new shadow would be cast only before 8:15 a.m. in and around the northern entry gate to the park.  Implementation of the proposed project would result in a very small (about 0.004 percent) increase in shadow cast on Boeddeker Park.  The net new shadow that would fall on Boeddeker Park would cover part of the entry gate area of the park.  This entry gate area does not contain tables or chairs, and is not expected to be subject to stationary use.  Because the new net shadow generated by the Office Scheme would cover an area of the park that would be used primarily for entering and existing [*sic*] the park, and because the net new shadow would occur during the early morning hours during a time of year when park use tends to diminish, the shadow would not adversely affect the use of Boeddeker Park."  The EIR thus clearly set forth specific information about the shade and shadow impacts, and analyzed why they would not produce a significant environmental effect.  Plaintiffs have not demonstrated the agency abused its discretion by omitting or failing to discuss those impacts, nor do they suggest the City's discussion precluded participation or informed decision making.  (See *Sierra Club, supra,* 6 Cal.5th at p. 516 [ultimate inquiry is whether EIR includes enough detail " 'to enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the proposed project' "].)

It is true San Francisco's Planning Code and General Plan discourage the creation of new shadows on parks, plazas, and open spaces.  (See S.F. Planning Code, §§ 146, 147, 295.)  It is also true the Planning Commission and Recreation and Park Commission adopted a joint resolution authorizing an increase to the shadow limit at Boeddeker Park, the Planning Commission approved a motion allocating additional shadow to the 5M Project, and the Recreation and Park Commission adopted a resolution recommending the 5M Project's new shadow on Boeddeker Park would not be adverse.  But the shadow

30

limits were policy restrictions, not a CEQA threshold, and the City's action in raising the limits does not establish a CEQA violation.[17]

Plaintiffs also argue commenters urged the City to consider the increase in shadow limits in the context of Boeddeker Park as a "special and rare resource" in the Tenderloin, contending such resources warrant "special emphasis" under the CEQA Guidelines, section 15125.[18] We reject this argument because plaintiffs do not cite any authority that sunlight on a park or open space, even in a dense urban area, constitutes a "rare or unique" resource for CEQA purposes. The cases on which they do rely are unhelpful to them. *Galante Vineyards v. Monterey Peninsula Water Management Dist.* (1997) 60 Cal.App.4th 1109, 1122, did not discuss the "rare or unique" language in the Guidelines, but found the project description inadequate for failure to emphasize the importance of wineries and viticulture in the environmental setting. *Friends of the Eel River v. Sonoma County Water Agency* (2003) 108 Cal.App.4th 859, 874–875, concerned an inadequate description of conditions in the water supply system and their impact on an endangered species of fish. *Preservation Action Council v. City of San Jose* (2006)

---

[17] Plaintiffs also rely on a comment from Attorney Eric Phillips that the EIR failed to disclose that without this special approval to raise the shadow limit on Boeddeker Park, the project would result in a significant impact. But Phillips's comment suffers the same logical fallacy of equating the City policies on shade and shadow with CEQA criteria for a significant impact without explaining why the shadow would create a significant environmental effect. Plaintiffs also assert the City's increase of the shadow limits was "an almost unprecedented action in approving a for-profit development," but the record reflects this was the fifth time the City had authorized shadow increases for Boeddeker Park.

[18] Guidelines, section 15125 regarding the EIR's description of the physical environmental conditions in the vicinity of the project provides, in relevant part: "Knowledge of the regional setting is critical to the assessment of environmental impacts. *Special emphasis should be placed on environmental resources that are rare or unique to that region and would be affected by the project.* The EIR must demonstrate that the significant environmental impacts of the proposed project were adequately investigated and discussed[,] and it must permit the significant effects of the project to be considered in the full environmental context." (Guidelines, § 15125, subd. (c), italics added.)

141 Cal.App.4th 1336, 1352–1353, concerned preservation of a historic building (and did not discuss Guidelines, § 15125 at all).

As to Yerba Buena Gardens, plaintiffs note the revised project increases the shadow effect on Yerba Buena Gardens and the children's play area to 29 percent compared to 21 percent with the schemes proposed in the DEIR, but the FEIR found no significant impact. They contend the City failed to proceed in the manner required by law when it adopted an EIR without disclosing the shadow impacts to Yerba Buena "Park," but they provide no record citations for that argument. To the contrary, the EIR disclosed there would be an increase of 0.09 percent of total shadows cast on Yerba Buena Gardens North in the winter months, when the park is least in use. The EIR explained the increase is relatively small compared to existing conditions and the use of the space would not be adversely affected. Similarly, the EIR noted overall total shadows cast on the children's play area would be 0.17 percent, and would not adversely affect use of the space due to the time and duration of the increased shadows (a short period during the winter months, after 3:30 p.m.).

Plaintiffs also complain the EIR did not consider mitigation measures or alternatives that would have reduced the shade and shadow impact, but fail to cite record evidence in support of their contention. In fact, the DEIR analyzed wind and shadow impacts for each of the four feasible project alternatives, and noted that for two of them (the Unified Zoning and No Project alternatives), the alternative would reduce the 5M Project's less-than-significant impacts or have no adverse shadow impact on open spaces in the vicinity of the site. Further, because the EIR did not identify impacts from new shadow or shade as a significant environmental effect, the City was not required to consider mitigation measures as cursorily argued by plaintiffs. (See *San Franciscans for Reasonable Growth v. City and County of San Francisco, supra,* 209 Cal.App.3d at p. 1517.)

### 7. Inconsistency with Area Plans and Policies

Plaintiffs contend the EIR failed to adequately account for inconsistencies between the 5M Project and applicable area plans and policies and thus failed to serve as the

32

required informational document under CEQA.[19]  An EIR must "discuss any inconsistencies between the proposed project and applicable general plans, specific plans and regional plans."  (Guidelines, § 15125, subd. (d).)  Here, the DEIR contained 36 pages of analysis comparing the 5M Project to area plans and policies, including, among many others, the San Francisco General Plan, the South of Market Redevelopment Plan, the Draft Central South of Market (Central Corridor) Plan, and the San Francisco Planning Code.  The DEIR also analyzed a "Code Compliant" alternative based on the level of development that would be allowed without amending any existing zoning or planning controls.

In their opening brief, plaintiffs contend the 5M Project is inconsistent with various policies and objectives of the East SoMa portion of the general plan and Draft Central SoMa Plan.  As Forest City notes, however, the 5M Project is not located in the East SoMa area, nor is it subject to the Draft Central SoMa Plan.[20]  Plaintiffs also argue the H1 Building is inconsistent with height requirements for the SoMa Youth and Family SUD, but the proposed project would be rezoned out of that area.  (See *Sierra Club v. City of Orange*, *supra*, 163 Cal.App.4th at pp. 543–544 [EIR was not required to discuss inconsistencies with county general plan where proposed project would be subject to city general plan if approved].)  On reply, plaintiffs do not dispute these facts or explain why the City would be required to evaluate the alleged inconsistencies.

---

[19] Plaintiffs also make a cursory claim that "The City's findings that the Project is *consistent* with area plans and policies is not supported by substantial evidence" (italics added), but they do not discuss that contention substantively or provide any record citations to support it.  Accordingly, we will not address it.  (Cal. Rules of Court, rule 8.204(a)(1)(B), (C).)

[20] Plaintiffs argue the 5M Project is inconsistent with "East SoMa Area Plan Policy 7.1," which they contend requires height and building intensity limits for new developments which would preserve the existing scale.  Forest City assumes this is a reference to the Draft Central SoMa Plan because there is no "Policy 7.1" in the East SoMa Area Plan.  For reasons discussed above, the East SoMa Area Plan does not apply to the 5M Project, and plaintiffs do not address this issue further on reply.

Plaintiffs further argue the 5M Project exceeds the height and intensity limits for the SoMa Youth and Family Special Use District (SUD), Residential/Service Mixed Use (RSD), and Downtown Support (C-3-S) zoning districts, and complain the project is "made to appear to be consistent with surrounding zoning" even though it is not. The record reflects, however, that the EIR disclosed that the 5M Project would require amendments to the general plan, the rezoning of portions of the site, and modification of existing development standards. The DEIR described the existing land use, bulk and height requirements on the project site, and compared existing planning controls to those proposed as part of the project. Plaintiffs have not shown how this discussion was misleading or inhibited informed decisionmaking or public participation.

Nor are we convinced by plaintiffs' argument the DEIR does not contain any meaningful discussion of the project's consistency with the Draft Central SoMa Plan. As its "draft" designation suggests, the Draft Central SoMa Plan had not been approved at the time of the EIR, and thus the EIR was not required to consider it. (See *Chaparral Greens v. City of Chula Vista* (1996) 50 Cal.App.4th 1134, 1145, fn. 7 (*Chaparral*) ["applicable" plan within meaning of Guidelines, § 15125, subd. (d) is plan that has already been adopted and thus legally applies to project; draft plans need not be evaluated].) Regardless, the DEIR compared the 5M Project with the Draft Central SoMa Plan and concluded it "generally implements the vision of the Central SoMa Plan" and "would not be expected to conflict with [it]," while noting the 5M Project would not be subject to the Central SoMa Plan. Moreover, though plaintiffs complain about the EIR's failure to divulge the Project's inconsistencies with the Draft Central SoMa Plan, plaintiffs themselves do not identify any.

We also find unpersuasive plaintiffs' general complaint that the inconsistencies with area plans and policies are so extensive as to amount to "spot zoning." "The essence of spot zoning is irrational discrimination. [Citation.] . . . ' "Spot zoning occurs where a small parcel is restricted and given lesser rights than the surrounding property, as where a lot in the center of a business or commercial district is limited to uses for residential purposes thereby creating an 'island' in the middle of a larger area devoted to other

uses. . . .” ’ ” (*Avenida San Juan Partnership v. City of San Clemente* (2011) 201 Cal.App.4th 1256, 1268–1269.)  On reply, plaintiffs concede the term "spot zoning" was not meant in a "strict legal sense," but as a "colloquial term" for the project's inconsistency with surrounding land uses.

Finally, plaintiffs raise a number of purported inconsistencies with the current zoning regulations, the City's "Transit-First Policy," the San Francisco Planning Code, and shadow limits on Boeddeker Park.  Plaintiffs' contentions that (1) the provision of parking spaces was inconsistent with the Transit-First Policy, and (2) the wind impacts are inconsistent with criterion established in the Planning Code, were not raised during the administrative process or in the trial court, and are therefore waived.[21]  As to the remainder of the issues listed in bullet-point fashion, plaintiffs fail to provide reasoned argument to support their points (and in some cases citations to the record), and accordingly, we summarily reject them.[22]

" 'CEQA requires an EIR to reflect a good faith effort at full disclosure; it does not mandate perfection, nor does it require an analysis to be exhaustive.' " (*Chaparral, supra,* 50 Cal.App.4th at p. 1145.)  The administrative record here reflects the City made a good faith effort to discuss inconsistencies with the applicable general plans.  Plaintiffs have not met their burden to demonstrate otherwise.

### 8.  Statement of Overriding Considerations

Plaintiffs argue the statement of overriding considerations adopted by the City when approving the project is not supported by substantial evidence because the City improperly considered the benefits before considering feasible mitigation measures or alternatives.  They also assert Forest City had the ability to configure the 5M Project so

---

[21] Plaintiffs contend the issue of inconsistency with the City's Transit-First Policy was raised by the Sierra Club in connection with the need to consider a zero-parking alternative, but plaintiffs did not assert the EIR was inadequate because it failed to disclose or analyze any inconsistency with the Transit-First Policy.

[22] As to the changes in floor area ratio (FAR) requirements for the Downtown Support (C-3-S) zoning district, however, we note the DEIR discussed the changes that would be required if the project were approved.

as to avoid impacts to Boeddeker Park and Yerba Buena Gardens but the EIR failed to consider such an alternative.

For several reasons, these arguments lack merit. First, the EIR did consider a no project alternative, which would have resulted in no new shadow impacts to Boeddeker Park and Yerba Buena Gardens, but rejected it because that alternative would not meet any of the project objectives except retention of the Chronicle Building and Dempster Printing Building. Second, as Forest City notes, the 5M Project was modified to substantially conform to the identified environmentally superior alternative. If there were no consideration of mitigation measures or alternatives, the revised project would not have been adopted. Finally, the statements plaintiffs cite in support of their argument regarding the "benefits" of the project were made by Commissioners Low and Levitan and Planning Director Rahaim during the hearing at which CEQA findings and the statement of overriding considerations were adopted—the precise point at which they were supposed to be weighing the benefits against the environmental impacts. (Guidelines, § 15093, subd. (a) ["CEQA requires the decision-making agency to balance, as applicable, the economic, legal, social, technological, or other benefits . . . of a proposed project against its unavoidable environmental risks when determining whether to approve the project."].) Plaintiffs have failed to demonstrate the statement of overriding considerations was not supported by substantial evidence.

## III. DISPOSITION

The judgment is affirmed. Respondents are to recover their costs on appeal.

36

_____
Margulies, J.

We concur:


_____
Humes, P. J.



_____
Kelly, J.[*]


A151521
*SOMCAN v. City and County of San Francisco*

[*] Judge of the Superior Court of the City and County of San Francisco, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| SOUTH OF MARKET COMMUNITY ACTION NETWORK et al.,<br><br>    Plaintiffs and Appellants,<br><br>v.<br><br>CITY AND COUNTY OF SAN FRANCISCO,<br><br>    Defendant and Respondent;<br><br>FOREST CITY CALIFORNIA RESIDENTIAL DEVELOPMENT, INC., et al.,<br><br>    Real Parties in Interest and Respondents. | A151521<br><br>(San Francisco City & County Super. Ct. No. CPF-15-514691)<br><br>ORDER CERTIFYING OPINION FOR PUBLICATION<br><br>[NO CHANGE IN JUDGMENT] |

THE COURT:

The opinion in the above-entitled matter filed on February 22, 2019, was not certified for publication in the Official Reports. After the court's review of a request under California Rules of Court, rule 8.1120, and good cause established under rule 8.1105, it is hereby ordered that the opinion should be published in the Official Reports.

There is no change in the judgment.

Dated:

_____
Margulies, Acting P.J.

Trial Court:   San Francisco City and County Superior Court

Trial Judge:   Hon. Garrett L. Wong

Counsel:

Provencher & Flatt, Rachel Mansfield-Howlett for Plaintiff and Appellants.

Dennis Herrera, City Attorney and Audrey Pearson, Deputy City Attorney for Defendant and Respondent.

Coblentz Patch Duffy & Bass, Jonathan R. Bass, Charmain G. Yu and Skye D. Langs for Real Parties in Interest and Respondents.