Filed 1/28/22; Certified for Publication 2/16/22 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(El Dorado)

----

| | |
|---|---|
| SAVE THE EL DORADO CANAL, | C092086 |
| Plaintiff and Appellant, | (Super. Ct. No. PC20190260) |
| v. | |
| EL DORADO IRRIGATION DISTRICT et al., | |
| Defendants and Respondents. | |

Appellant Save the El Dorado Canal seeks reversal of a judgment entered after the trial court denied its petition for writ of mandate. The petition challenged certification of an environmental impact report (EIR) and approval of a project under the California Environmental Quality Act (CEQA).[1] The challenged project, the Upper Main Ditch

---

[1] CEQA is codified at Public Resources Code section 21000 et seq. Hereafter, undesignated statutory references are to the Public Resources Code. Regulations promulgated to implement CEQA are set forth in California Code of Regulations, title 14,

1

piping project, was approved by the El Dorado Irrigation District (District) and the El Dorado Irrigation District Board of Directors (Board of Directors) (collectively, respondents). The proposed project would have replaced roughly three miles of the District's unlined earthen ditch system (the Upper Main Ditch) with a buried water transmission pipeline to be located either beneath the ditch itself or beneath the berm alongside the ditch. Under this proposal, although the Upper Main Ditch would no longer be utilized to convey the District's water supply, it would remain available to carry stormwater runoff and the District would retain an easement for maintenance. Respondents approved an alternative to the proposed project, the Blair Road alternative, which aligns a portion of the pipeline with the Upper Main Ditch but places the majority of the pipeline beneath a roadway, Blair Road, resulting in the District's abandonment of most of the ditch.

On appeal, appellant contends respondents' approval of the challenged project violated CEQA because: (1) the EIR failed to provide an adequate project description because it omits "a crucial fact about the ditch the District proposes to 'abandon,' " i.e., "the Main Ditch system is the *only* drainage system" for the watershed; and (2) the EIR failed to adequately analyze the impacts of abandonment to hydrology, biological resources, and risks associated with wildfires.

We affirm. As we shall explain, respondents did not abuse their discretion in approving the Blair Road alternative. The draft and final EIR's adequately apprised respondents and the public about both the nature of the watershed and the fact that the District would no longer maintain the abandoned portion of the Upper Main Ditch.

section 15000 et seq. We shall refer to these regulations as "Guidelines." (§ 21083, subds. (a), (f) ["Office of Planning and Research shall prepare and develop proposed guidelines" and "Secretary of the Resources Agency shall certify and adopt guidelines"]; see also *Association of Irritated Residents v. Kern County Bd. of Supervisors* (2017) 17 Cal.App.5th 708, 718, fn. 2 (*Irritated Residents*).)

These environmental documents also adequately analyzed the Blair Road alternative's impacts to hydrology, biological resources, and risks associated with wildfires.

BACKGROUND

The District, a public water agency located in El Dorado County, operates a water system that relies exclusively on surface water to meet its potable water demand. The system contains more than 1,250 miles of pipe and 27 miles of earthen ditches connecting various water facilities, including five water treatment plants (WTP's). One of the District's main water conveyance features is the Upper Main Ditch, a roughly three-mile stretch of open and unlined ditch connecting the District's Forebay Reservoir to the Reservoir 1 WTP.

*The Proposed Project*

The District proposed to convert the Upper Main Ditch into a buried 42-inch pipeline that would span the entirety of the existing ditch. Several reasons were advanced for the conversion; foremost among these was water conservation. As the draft EIR explains, citing a 2017 study, the open and unlined nature of the Upper Main Ditch results in "11-percent to 33-percent" of the water conveyed through the ditch being lost "due to seepage and evapotranspiration" each year, "depending on flow rates and annual diversions." Citing data from 2009 to 2015, the draft EIR estimates "minimum water savings of approximately 1,350 acre-feet per year and an average of nearly 1,800 acre-feet can be expected to result from piping the ditch." This "would assist the District in meeting water conservation mandates" imposed by the Legislature and the State Water Resources Control Board, the latter acting at the direction of the Governor.

The proposed project would also improve water quality because "[t]he existing unlined and uncovered Upper Main Ditch is currently susceptible to contamination and failure, resulting in erosion and water quality issues that increase the contaminant load that must be removed by the treatment process at the WTP." Contaminants identified in

3

the Upper Main Ditch during a water quality analysis conducted by the District include "total coliform, E. coli, and turbidity."

The upstream end of the new pipeline would connect to the Forebay Reservoir valve house and would then "follow[] the existing ditch alignment for the entire 15,400 feet" of the Upper Main Ditch. As the draft EIR explains, the buried pipeline "would vary between being completely under the existing ditch to partially under the ditch and partially under the berm, to completely under the berm." Once the new pipeline is placed beneath the ditch/berm, the District would backfill the pipe with "engineered fill and select backfill material," compact the surface, and reshape the ditch "to allow for passage of stormwater flows up to the current 10-year storm event capacity." Finally, "[a]t the downstream end, a metering and inlet structure would also be constructed within the ditch to turn water into the Reservoir 1 WTP."

### The Blair Road Alternative

In addition to the proposed project, the District considered three alternatives: two alternative alignments for the pipeline, and a "No-Project Alternative" that would have left the Upper Main Ditch unaltered in its operation. Because the Blair Road alternative was ultimately chosen, we describe this alternative in some detail.[2]

The Blair Road alternative also converts the Upper Main Ditch into a buried 42-inch pipeline, but rather than running the pipe along the existing ditch, this alternative alignment places the pipe across District-owned property for about 400 feet from the Forebay Reservoir valve house to Blair Road, continues along Blair Road for about 8,200 feet until it reaches the Upper Main Ditch crossing, then continues along the ditch for

---

[2] We do not describe the other alternative, referred to as the "Combined Alternative," but note here that respondents ultimately rejected this alternative alignment because, among other reasons, it "would require the most number of trees to be removed, and tree removal is a matter of public concern in El Dorado County."

about 1,500 feet before traveling another 2,200 feet across private property to the Reservoir 1 WTP.  The total length of this alignment is about 12,300 feet, about 3,100 feet shorter than the proposed project.

The pipeline connection at the Forebay Reservoir valve house and the inlet structure at Reservoir 1 WTP would be the same as the proposed project.  The portion of the pipeline installed beneath the existing ditch would also "be constructed in the same manner as the proposed Project."  With respect to "[t]he transition between the non-constructed sections of ditch and constructed sections of ditch," the draft EIR explains that there would be "a graded slope . . . to allow normal gravity flow of stormwater within the channel to be conveyed as under the current (No Project) conditions."  More on this later.

Portions of the pipeline "that would go through cross-country terrain . . . would be placed underground and the surface would be regraded with a two-percent cross slope over the pipe for maintenance purposes."  Finally, as previously indicated, most of this alternative alignment would be installed beneath Blair Road.  Pipeline construction along the roadway would be significantly different than placing it along the ditch alignment. However, because this aspect of the project is not at issue in this appeal, we decline to describe it in any detail.

### The District's Compliance with CEQA

In June 2015, the District issued an initial study and notice of preparation.[3] During the subsequent 30-day public review and comment period, the District held a

---

[3]     "[A]n initial study is the preliminary environmental analysis [citation] and its purposes include '[p]rovid[ing] the lead agency with information to use as the basis for deciding whether to prepare an EIR or negative declaration,' '[e]nabl[ing] an applicant or lead agency to modify a project, mitigating adverse impacts before an EIR is prepared, thereby enabling the project to qualify for a negative declaration,' and '[p]rovid[ing] documentation of the factual basis for the finding in a negative declaration that a project

scoping meeting to provide a forum for public comments on the scope and focus of the EIR, including feasible alternatives. The District also conducted various public outreach activities to encourage public involvement, including maintaining a Web site with information about the proposed project and participating in a town hall meeting in Pollock Pines in November 2017.

In June 2018, the District issued the draft EIR, analyzing potential significant effects associated with the proposed project and three project alternatives, including the Blair Road alternative. As mentioned, appellant's challenge to the EIR is limited to challenging the adequacy of (1) the project description related to the Upper Main Ditch's role in the watershed's drainage system, and (2) the impact analysis related to hydrology, biological resources, and risks associated with wildfires. We quote extensively from the relevant sections of the draft EIR in the discussion portion of this opinion. For now, we provide a very brief summary of the project description related to the Upper Main Ditch's role in the watershed and the relevant impact conclusions reached.

Beginning with the Upper Main Ditch's role in the watershed, the draft EIR describes the extensive system of open ditches constructed by the mining industry in the 1800's and explains that this system was converted over time into a water delivery system for residential and agricultural use. Part of this system is the Upper Main Ditch. As mentioned previously, it spans roughly three miles from the Forebay Reservoir to the Reservoir 1 WTP and "delivers a maximum of 15,080 acre-feet of raw water supplies annually." The draft EIR also notes that the Upper Main Ditch passes through private property and the District "asserts an easement across such property to own and operate

---

will not have a significant effect on the environment.' [Citation.]" (*Lighthouse Field Beach Rescue v. City of Santa Cruz* (2005) 131 Cal.App.4th 1170, 1180.) "A notice of preparation is a brief notice sent by the lead agency to (1) notify responsible agencies that the lead agency plans to prepare an EIR for the project and (2) solicit guidance from those agencies as to the scope and content of environmental information included in the EIR. [Citations.]" (*Irritated Residents*, *supra*, 17 Cal.App.5th at p. 723, fn. 4.)

the ditch for water supply conveyance." The draft EIR further explains that in addition to water conveyance for the District, "the Upper Main Ditch passively intercepts stormwater runoff that would otherwise naturally flow down slope." It does so for a drainage area of approximately 315 acres and at full capacity "can currently accommodate stormflows that are equivalent to a 10-year design stormflow." Flows in excess of such a 10-year storm event "overtop the ditch and follow their natural drainage course, eventually flowing towards the South Fork of the American River." The proposed project, as mentioned previously, would "leave[] a remnant channel in place, thereby allowing stormwater for 10-year storm flows to continue following pre-Project drainage patterns." Describing the Blair Road alternative, the document states: "The ditch would continue to have the capacity to passively receive and convey stormwater flows during storm events. Except where the Blair Road Alternative would be located within the existing ditch corridor, the District would no longer use the existing ditch under this alternative."

The draft EIR analyzes this aspect of hydrology with respect to the Blair Road alternative in impact HYD-3b. We provide this analysis in its entirety later. The draft EIR concluded "the potential to substantially alter existing drainage patterns is less than significant with mitigation incorporated" because a certain mitigation measure (MM GEO-1)[4] "would be implemented to reduce any potential construction impacts to a less than significant level" and the existing ditch "would continue to have the capacity to passively receive and convey stormwater flows during storm events."

Turning to the draft EIR's analyses of potential impacts to biological resources, as we explain more fully later, two are important to the issues raised in this appeal: (1) whether the project would have a substantial effect on any riparian habitat or other sensitive natural community (impact BIO-2); and (2) whether the project would conflict

---

[4]     We describe this and other relevant mitigation measures adopted by respondents in the discussion portion of the opinion.

with any local policies or ordinances protecting biological resources, such as a tree preservation policy or ordinance (impact BIO-3). Again, we provide these analyses in their entirety later. The draft EIR concluded with respect to the first of these potential impacts: "Because the Blair Road Alternative would be within the roadway and/or areas lacking riparian habitat or other sensitive natural communities and impacts to oaks would be mitigated through MM BIO-6, the impact would be less than significant with mitigation."

With respect to any potential conflict with local policies or ordinances protecting biological resources, such as a tree preservation policy or ordinance, the draft EIR concluded: (1) "the Blair Road Alternative does not conflict with the El Dorado County General Plan Conservation Element"; (2) "with the implementation of MM BIO-6, the Blair Road Alternative would be consistent with the [Oak Resources Management Plan] and not conflict with a local plan or policy protecting biological resources"; and (3) because "the District would adhere to the tree removal procedures required by the County's Tree Mortality Tree Removal Plan [citation], [and] the California Department of Forestry and Fire Protection (CAL FIRE)[,] . . . impacts related to the spread of pine bark beetle would be the same as that of the proposed Project," i.e., "[l]ess than [s]ignificant."

Finally, the draft EIR analyzes potential wildfire risks associated with the Blair Road alternative in impact HAZ-3b, noting this alternative alignment "would have similar impacts related to wildland fire risk as described under the proposed Project," i.e., "[l]ess than [s]ignificant." This analysis will also be provided later in this opinion.

The CEQA-mandated 45-day public review and comment period for the draft EIR ended in July 2018. During that period, the District held a public meeting to provide a question and answer session for the public with District and consultant staff, and to receive public comments. Due to a substantial number of requests to extend the review and comment period, the Board of Directors voted to provide an additional 30 days for

8

the public to do so. That additional 30-day period ended in September 2018. The District received about 200 comment letters/e-mails regarding the draft EIR. These comments, as well as responses, are included in the final EIR. The final EIR was issued in January 2019.

Appellant's arguments in this appeal focus on three of the comments received, one from El Dorado County (the County), one from California's Department of Fish and Wildlife (CDFW), and one from appellant. We provide the content of these comments, as well as a representative example of individual comments expressing concern about wildfires, and the final EIR's responses to these comments, in the discussion portion of this opinion.

### *Approval of the Blair Road Alternative*

In April 2019, respondents approved the Blair Road alternative by resolution of the Board of Directors. The resolution also certified the final EIR and adopted the District's findings of fact regarding the environmental review process, selection of the Blair Road alternative, rejection of the proposed project and other alternatives as infeasible, and implementation of mitigation measures as conditions to approval of the project. A mitigation monitoring and reporting program (MMRP) was also adopted.

With respect to the no-project alternative, respondents found: "Implementing the No Project Alternative would: 1) prevent [the District] from converting the Upper Main Ditch from its current open conveyance status to a secure raw water buried transmission pipeline, 2) not meet any of the project objectives, and 3) result in ongoing adverse impacts associated with continued water loss and degradation of water quality. For these reasons, the [District's] Board of Directors rejects the No-Project Alternative as infeasible within the meaning of CEQA."

With respect to the proposed project, respondents found this proposal would meet all project objectives, but "would have greater potential impacts to residents along the ditch, from construction and tree removal, and likely would require eminent domain

9

action if the District were unable to negotiate the necessary easement rights with private property owners to construct the pipeline along this alignment." The District concluded, "[b]ased on prior unsuccessful efforts to negotiate the necessary easement rights for the Proposed Project," that it likely would again be unable to do so. "Accordingly, for environmental, legal and social reasons, the [District's] Board of Directors rejects the Proposed Project as infeasible within the meaning of CEQA."

With respect to the Blair Road alternative, respondents found this alternative would also meet project objectives and "would require the least number of trees to be removed, would primarily occur within the public right-of-way of Blair Road and would therefore involve less construction activities in close proximity to private residences, reducing community impacts of concern, and require the fewest number of acquisitions of new permanent easements across private parcels to construct, maintain, and operate the proposed pipeline. Accordingly, the [District's] Board of Directors finds that the Blair Road Alternative is feasible within the meaning of CEQA."

Turning to the potential impacts raised by appellants in this appeal, respondents found the mitigation measures alluded to earlier, and more fully discussed later in this opinion, would lessen the significance of potentially significant impacts to less-than-significant levels and adopted those measures as conditions to approval of the project.

A notice of determination was filed on April 22, 2019, stating the project would not have a significant effect on the environment, an EIR was prepared, mitigation measures were made a condition of approval, an MMRP was adopted, a statement of overriding considerations was not adopted, and findings were made pursuant to CEQA.

### Proceedings Before the Trial Court

In May 2019, appellant filed a petition for a writ of mandate challenging certification of the EIR and approval of the project under CEQA. Extensive briefing was submitted by the parties. In a 74-page ruling, thoroughly addressing each of 10

10

contentions raised by appellant, the trial court denied the petition.[5]  Judgment was thereafter entered in respondents' favor.  This appeal followed.

DISCUSSION

I

*CEQA Overview and Standard of Review*

"With narrow exceptions, CEQA requires an EIR whenever a public agency proposes to approve or to carry out a project that may have a significant effect on the environment.  [Citations.]  'Project' means, among other things, '[a]ctivities directly undertaken by any public agency.'  [Citation.]  ' "Significant effect on the environment" means a substantial, or potentially substantial, adverse change in the environment.'  [Citations.]  The Legislature has made clear that an EIR is 'an informational document' and that '[t]he purpose of an environmental impact report is to provide public agencies and the public in general with detailed information about the effect which a proposed project is likely to have on the environment; to list ways in which the significant effects of such a project might be minimized; and to indicate alternatives to such a project.'  [Citations.]"  (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 390-391, fns. omitted (*Laurel Heights*).)

"The EIR is the primary means of achieving the Legislature's considered declaration that it is the policy of this state to 'take all action necessary to protect, rehabilitate, and enhance the environmental quality of the state.'  [Citation.]  The EIR is therefore 'the heart of CEQA.'  [Citations.]  An EIR is an 'environmental "alarm bell" whose purpose it is to alert the public and its responsible officials to environmental

---

[5]     As we explain immediately below, we are tasked in this appeal with reviewing respondents' decision to approve the project, not the trial court's ruling.  (See *Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 427 (*Vineyard*).)  We therefore decline to describe that ruling in any detail.

11

changes before they have reached ecological points of no return.' [Citations.] The EIR is also intended 'to demonstrate to an apprehensive citizenry that the agency has, in fact, analyzed and considered the ecological implications of its action.' [Citations.] Because the EIR must be certified or rejected by public officials, it is a document of accountability. If CEQA is scrupulously followed, the public will know the basis on which its responsible officials either approve or reject environmentally significant action, and the public, being duly informed, can respond accordingly to action with which it disagrees. [Citations.] The EIR process protects not only the environment but also informed self-government." (*Laurel Heights, supra*, 47 Cal.3d at p. 392.)

Our review of respondents' compliance with CEQA in this case " 'extend[s] only to whether there was a prejudicial abuse of discretion.' [Citation.] Such an abuse is established 'if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence.' [Citations.]" (*Vineyard, supra*, 40 Cal.4th at pp. 426-427, fns. omitted.) "Judicial review of these two types of error differs significantly: While we determine de novo whether the agency has employed the correct procedures, 'scrupulously enforc[ing] all legislatively mandated CEQA requirements' [citation], we accord greater deference to the agency's substantive factual conclusions. In reviewing for substantial evidence, the reviewing court 'may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable,' for, on factual questions, our task 'is not to weigh conflicting evidence and determine who has the better argument.' [Citation.]" (*Id.* at p. 435.)

"Whether an EIR has omitted essential information is a procedural question subject to de novo review." (*Banning Ranch Conservancy v. City of Newport Beach* (2017) 2 Cal.5th 918, 935.) However, we do not " 'pass upon the correctness of the EIR's environmental conclusions, but only upon its sufficiency as an informative document.' [Citation.] [¶] This standard of review is consistent with the requirement

12

that the agency's approval of an EIR 'shall be supported by substantial evidence in the record.' [Citation.] In applying the substantial evidence standard, 'the reviewing court must resolve reasonable doubts in favor of the administrative finding and decision.' [Citation.] The Guidelines define 'substantial evidence' as 'enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached.' [Citation.]" (*Laurel Heights*, *supra*, 47 Cal.3d at pp. 392-393.)

Finally, as stated previously, we review "the agency's action, not the trial court's decision; in that sense appellate judicial review under CEQA is de novo. [Citations.] We therefore resolve the substantive CEQA issues . . . by independently determining whether the administrative record demonstrates any legal error by [respondents] and whether it contains substantial evidence to support [respondents'] factual determinations." (*Vineyard*, *supra*, 40 Cal.4th at p. 427.)

## II

### *Adequacy of the EIR's Project Description*

Appellant contends approval of the challenged project violated CEQA because the EIR failed to adequately describe the project by omitting "a crucial fact about the ditch the District proposes to 'abandon,' " i.e., "the Main Ditch system is the *only* drainage system" for the watershed. We disagree.

As a preliminary matter, respondents assert this contention is forfeited because appellant failed to set forth the relevant portions of the draft EIR's project description in its opening brief on appeal, relying on our decision in *Citizens for Positive Growth & Preservation v. City of Sacramento* (2019) 43 Cal.App.5th 609 (*Citizens*). There, the appellant asserted that the EIR challenged in that case was deficient because it did not adequately discuss *any* of the project alternatives. (*Id.* at p. 626.) We addressed the adequacy of the EIR's discussion of *only one* of these alternatives, however, because the appellant's briefing on appeal "addresse[d] only the 'no project' alternative discussion."

13

(*Ibid.*)  As we explained:  "An appellant must direct us to the parts of the record that show the claimed error.  'An appellate court is not required to search the record to determine whether or not the record supports appellant['s] claim of error.  It is the duty of counsel to refer the reviewing court to the portions of the record which support appellant['s] position.'  [Citation.]  Under the California Rules of Court, each brief must '[s]upport any reference to a matter in the record by a citation to the volume and page number of the record where the matter appears.'  [Citation.]  'If no citation "is furnished on a particular point, the court may treat it as [forfeited]." '  [Citation.]"  (*Id*. at p. 626, fn. 8.)

Here, appellant does something different, but equally problematic.  Under the heading "The Project Description omits crucial facts," appellant provides the applicable legal standard for assessing the sufficiency of a project description, but then, in arguing that standard is not met, shifts the argument to assert the EIR provides "an 'inadequate description of the environmental setting for the project . . . .' "  These are separate and distinct issues.  (See *San Joaquin Raptor Rescue Center v. County of Merced* (2007) 149 Cal.App.4th 645, 654-659.)  In order to properly raise the latter issue, appellant was required to do so under a separate heading.  (Cal. Rules of Court, rule 8.204(a)(1)(B); *San Joaquin River Exchange Contractors Water Authority v. State Water Resources Control Bd.* (2010) 183 Cal.App.4th 1110, 1135 [argument forfeited for lack of separate heading].)  Then, still under the heading indicating the project description is at issue, appellant challenges the EIR's impact analysis and conclusion that the Blair Road alternative's abandonment of most of the Upper Main Ditch "would not result in significant damage" to the environment through flooding.[6]  Finally, the argument returns to discuss the importance of an accurate, stable, and finite project description.  Because

---

**6**     This issue is properly raised and argued later in the opening brief under a separate heading.  We address it in the next section of the discussion.

14

that is the only issue indicated by the heading of this particular section of appellant's opening brief, that is the only issue we address in this portion of the opinion. Any assertion that the EIR failed to adequately describe the existing environmental setting is forfeited.

We now address the project description. As our colleagues at the First Appellate District recently explained in *South of Market Community Action Network v. City and County of San Francisco* (2019) 33 Cal.App.5th 321, 332 (*South of Market*):

"A [draft EIR] must include a project description. [Citation.] The project description must contain (1) the precise location and boundaries of the proposed project; (2) a statement of the objectives sought by the proposed project, including the underlying purpose; (3) a general description of the project's technical, economic, and environmental characteristics; and (4) a statement briefly describing the intended uses of the EIR. [Citation.] The description should not, however, 'supply extensive detail beyond that needed for evaluation and review of the environmental impact.' [Citation.] The description must include the entirety of the project, and not some smaller portion of it. [Citation.]

" '[A]n accurate, stable and finite project description is the *sine qua non* of an informative and legally sufficient EIR.' [Citation.] 'Only through an accurate view of the project may affected outsiders and public decision-makers balance the proposal's benefit against its environmental cost, consider mitigation measures, assess the advantage of terminating the proposal . . . and weigh other alternatives in the balance.' [Citation.] A project description that gives conflicting signals to decision makers and the public about the nature of the project is fundamentally inadequate and misleading. [Citation.] Further, '[a] curtailed, enigmatic or unstable project description draws a red herring across the path of public input.' [Citation.] 'Whether an EIR correctly describes a project is a question of law, subject to de novo review.' [Citation.]" (*South of Market*, *supra*, 33 Cal.App.5th at p. 332.)

15

Appellant's assertion that the draft EIR failed "to disclose the true nature of the Upper Main Ditch" is without merit. The draft EIR explains: "Thousands of miles of earthen/open ditches were constructed in the American River watershed in the 1800's to support the gold mining industry. As land uses and water demands shifted from gold mining to agriculture and domestic and municipal uses, some of these ditch systems were incorporated into the water delivery systems of public and private water suppliers. Today, portions of this extensive system convey both treated and raw water to thousands of customers in the region. These earthen ditches have long served a valuable role in providing water service to the local foothill communities." The Upper Main Ditch, "the upper section of the District's Main Ditch raw water delivery system," is part of this extensive system of ditches. It "delivers a maximum of 15,080 acre-feet of raw water supplies annually" from the Forebay Reservoir to the Reservoir 1 WTP. The draft EIR also notes that the Upper Main Ditch passes through private property and the District "asserts an easement across such property to own and operate the ditch for water supply conveyance."

Addressing stormwater considerations, the draft EIR states: "In addition to water deliveries from Forebay Reservoir, the Upper Main Ditch passively intercepts stormwater runoff that would otherwise naturally flow down slope. The drainage area of the Upper Main Ditch between Forebay [Reservoir] and Reservoir 1 WTP is approximately 315 acres (Figure 2.6-4)." Figure 2.6-4 is a map depicting 11 watershed drainage areas spanning the length of the Upper Main Ditch. Based on a 2016 analysis, the draft EIR estimates "the Upper Main Ditch can currently accommodate stormflows that are equivalent to a 10-year design stormflow. Existing swales along the ditch allow flows in excess of 10-year stormflows to overtop the ditch and follow their natural drainage course, eventually flowing towards the South Fork of the American River."

Describing the proposed project, the draft EIR explains: "The final design of the constructed pipeline alignment surface leaves a remnant channel in place, thereby

16

allowing stormwater for 10-year storm flows to continue following pre-Project drainage patterns."  Describing the Blair Road alternative, the document states:  "The ditch would continue to have the capacity to passively receive and convey stormwater flows during storm events.  Except where the Blair Road Alternative would be located within the existing ditch corridor, the District would no longer use the existing ditch under this alternative."  As previously described in some detail, only a small portion of the pipeline would be located within the existing ditch corridor under the Blair Road alternative. With respect to "[t]he transition between the non-constructed sections of ditch and constructed sections of ditch," the draft EIR explains that there would be "a graded slope . . . to allow normal gravity flow of stormwater within the channel to be conveyed as under current (No Project) conditions."

We conclude this description adequately discloses the nature of the Upper Main Ditch and straightforwardly reveals that the Blair Road alternative would result in abandonment of the District's maintenance easement over most of the existing ditch.  Nor are we persuaded by appellant's suggestion that the EIR was required to specifically state that the Main Ditch system is the watershed's *only* drainage system."  That may be true. However, "when assessing the legal sufficiency of an EIR, we do not look for perfection, but 'adequacy, completeness, and a good faith effort at full disclosure.'  [Citations.]  That standard was met here."  (*South of Market*, *supra*, 33 Cal.App.5th 321 at p. 334.)

Appellant also asserts that the project description contains "a direct misstatement of fact" because the description of the proposed project indicates that "where the pipeline alignment is not within the existing ditch, the ditch would be partially filled and reshaped to provide a similar level of stormwater capacity for flows up to the 10-year event." Appellant argues:  "This is false.  For the areas where the pipeline alignment is not with[in] the existing ditch, the ditch would be *abandoned* and left to the underlying property owner[s] to do with as they please."  Not so.  The draft EIR makes quite clear that the sentence with which appellant takes issue refers to the proposed project, not the

17

Blair Road alternative. As described in greater detail earlier, the proposed project would have aligned the pipeline along the Upper Main Ditch, but not always "within the existing ditch." Instead, "the alignment would vary between being completely under the existing ditch to partially under the ditch and partially under the berm, to completely under the berm." Thus, the statement "where the pipeline alignment is not within the existing ditch" refers to the portion of *the proposed project* alignment that would have placed the pipeline beneath the berm along the Upper Main Ditch. It simply does not refer to Blair Road alternative alignment. Abandonment of the ditch would occur under the Blair Road alternative, as appellant correctly notes, but we have already concluded the project description for that alternative adequately reveals such an abandonment would occur. This fact is not hidden, as appellant suggests.

The remaining argument supplied by appellant, ostensibly on the issue of project description, is more properly viewed as a challenge to the EIR's impact analysis. We turn to that issue now.

### III

#### *Adequacy of the EIR's Impact Analysis*

Appellant challenges the adequacy of the EIR's analysis of the following: (A) impacts to hydrology; (B) impacts to biological resources; and (C) the increased risk to the community from wildfires. We conclude each challenged aspect of the EIR was adequately analyzed.

### A.

#### *Impacts to Hydrology*

The draft EIR analyzes the relevant hydrological impact of the Blair Road alternative, specifically watershed drainage, in impact HYD-3b:

18

"The Blair Road Alternative would have similar impacts to hydrology and drainage as the proposed Project (Impact HYD-3a).[7]  The section of the Blair Road Alternative that would be installed in the existing ditch would be constructed in the same manner as the proposed Project and the transition between the constructed sections and non-constructed sections of ditch would include a graded slope to allow normal gravity flow of stormwater within the channel as under the current (No Project) conditions.  The ditch would continue to have the capacity to passively receive and convey stormwater flows during storm events.  Drainage for stormwater flows would follow the existing ditch as under current conditions as described under the proposed Project above and would have adequate capacity to convey stormwater equal to existing conditions.  For the portions of the Upper Main Ditch where the pipeline would not be constructed in the ditch alignment, the District would no longer use those portions of the ditch.  As such, the District's existing easements across private parcels to own and operate the unused portions of the ditch would revert to the underlying property owners.  The District would take appropriate future maintenance actions within its pipeline easement rights to maintain the ditch as necessary to protect and maintain District facilities.  Additionally, construction on the cross-country portions of this alignment would require construction on undeveloped land, which could cause adverse changes to the existing drainage pattern

---

**7**      Impact HYD-3a states in relevant part that the proposed project "would allow for continued passage of stormwater flows along the ditch alignment, similar to the existing capacity of the ditch," restating the project description set forth above, and adding:  "As evaluated in [the 2016 analysis], the current ditch, when flowing at full capacity, conveys approximately 40 [cubic feet per second] in the upper reaches, 60 [cubic feet per second] at the Blair Road crossing, and nearly 70 [cubic feet per second] closer to Reservoir 1.  The ditch can convey a 10-year storm event with peak flows ranging from approximately 6 to 71 [cubic feet per second] [(citation to the 2016 analysis)].  Under the proposed Project, the reshaped channel would continue to have the capacity to allow for passage of flows equivalent to a 10-year storm event, and therefore, the proposed Project is not expected to alter drainage patterns."

19

if handled incorrectly. The pipeline placement in these cross-country portions would occur over a short period of time and MM GEO-1[8] would be implemented to reduce any potential construction impacts to a less than significant level. The soils in this area would be recontoured post-construction to match the existing grade of the area and provide for adequate draining similar to historical flows. Therefore, the potential to substantially alter existing drainage patterns is less than significant with mitigation incorporated."

Appellant takes issue with the conclusion that the Blair Road alternative would not significantly impact drainage of the watershed, asserting "the EIR provides no consistent information about the existing drainage in the watershed." We have already addressed and rejected this assertion above. Then, addressing MM GEO-1, appellant argues "[m]itigation of construction impacts will do nothing to address future stormwater conveyance through the abandoned ditch, and there are no mitigation measures proposed to alleviate or avoid the foreseeable impacts that will occur *when the abandoned ditch becomes clogged with vegetation and debris*." (Italics added.)

In support of the foreseeability of this italicized assumption, appellant cites the County's comment letter, which states in relevant part: "The County believes that the Proposed Project and the Blair Road Alternative would reduce the capacity of the ditch to convey surface runoff at historic levels. Runoff events larger than the 10-year design event would have the potential to trigger these potential impacts. The effects of these changes should be analyzed to a greater detail in the EIR. [¶] . . . The County disagrees with the findings for Impacts HYD-3 and HYD-4. Preparation and implementation of a Stormwater Pollution Prevention Plan is sufficient for management of construction and operations impacts to water quality, erosion and sediment control. However, the proposed changes to the conveyance capacity of the ditch cannot be managed by the

---

**8**    MM GEO-1 is a mitigation measure requiring the District to prepare and implement a stormwater pollution prevention plan.

20

proposed mitigation measure.  The County believes a much more robust approach is necessary to fully mitigate these impacts, for the Proposed Project and the Blair Road Alternative.  With the Blair Road Alternative, portions of the main ditch would be abandoned by [the District], and ownership of the ditch (and intercepted stormwater runoff) would revert to the landowners.  The County sees this as problematic.  Capacity of the ditch to convey historic runoff volumes would be impacted by any private activities, and the absence of [the District's] maintenance activities.  [The District] should provide greater details of how the ditch property will be disposed of or 'relinquished' to ensure that property owners understand that the ditch conveys stormwater runoff and that they are responsible to maintain the facility so that it is adequate to convey this runoff after relinquishment."

In response, the final EIR referred the County to "Master Response-8 (Stormwater Impacts)" and specified studies "identifying drainage areas from which Upper Main Ditch receives surface water runoff."

Master response-8 first describes the Upper Main Ditch's current capacity to convey surface water runoff and concludes the Blair Road alternative "would not change the capacity to convey stormwater, because . . . the existing ditch would be unaffected except in areas where the new pipeline would enter the ditch, and in those areas, the pipeline and remnant ditch would be constructed in the same manner as the proposed Project."

The response then specifically addresses flooding risks and ditch maintenance. We provide those sections of the response in their entirety:

"**Flooding Risks**

"The comments received included comments regarding the potential for increased flooding risks.  The Project is not expected to result in an increased risk of frequency of flooding because neither the proposed Project, nor the Project alternatives, would reduce the capacity of the ditch corridor to receive and convey storm water runoff [citation].

21

Under the Project, the flooding risks are expected to be similar to existing baseline conditions, which means that like under existing conditions, there may be times when stormwater runoff exceeds the capacity of the ditch corridor and overflows the ditch [citation]. Impact HYD-3 on pages 3.9.13-3.9.14 of the [draft EIR] further discuss flooding and concludes that the proposed Project and each of the alternatives would not result in a significant impact related to drainage patterns or flooding.

"**Maintenance of Ditch**

"There were comments received regarding how the ownership and maintenance of the ditch under the proposed Project and Project alternatives may affect hydrology. For example, the [County] submitted comments raising concerns about ownership of the ditch reverting to the landowners, for those portions of the ditch that would not be occupied by the Project [citation]. The County expressed concerns about 'private activities' that could impact the capacity of the ditch to convey historic runoff volumes [citation]. As described in the[draft EIR], under the proposed Project and each of the Project alternatives, there are portions of the ditch that the District would no longer use, and control of those portions of the ditch would revert to the landowners due to the District's non-use of the District easement rights.

"Pursuant to CEQA, the District must consider the direct and reasonably foreseeable indirect effects, or impacts, of the proposed Project and the Project alternatives on the physical environment [citations]. CEQA defines 'significant effect' as a substantial, or potentially substantial, adverse change in the physical conditions within the area affected by the project [citation].

"As discussed herein and in the [draft EIR], the Project does not propose to change the physical conditions of the Upper Main Ditch corridor as they relate to capacity to convey stormwater. The proposed Project design includes a reconfigured ditch corridor which is designed to be capable of conveying flows from a 10-year storm, which is the same as the estimated capacity of the existing ditch corridor. Under the proposed Project

22

and the Project alternatives, those portions of the existing ditch that are not utilized for the Project would no longer be used by the District and control of those portions of the ditch would revert to the landowners.  The focus[ ]of the concerns raised by the comments is whether possible future changes in the physical condition of the ditch, once the District no longer holds an easement to convey its surface water supplies or controls the affected portions, would result in significant impacts due to flooding.

"In preparing the[draft EIR], the District made several assumptions that were integral to the developement [*sic*] of the Project Description, including the Project alternatives [citation].  In particular the District reasonably assumed that private action (maintaining the ditch as an incident of their ownership) or inaction (not filling the ditch or taking any action that would reduce its stormwater capacity) by surrounding landowners will ensure that the Main Ditch retains the current capacity to convey stormwater across their property and does not otherwise create the risk of a significant impact from flooding.  Substantial evidence supporting this assumption includes:  (1) specified fill activity is regulated by the County to ensure that fill does not result in significant environmental impacts; (2) private landowners have an incentive to avoid harm to their own property or that of third parties (including avoiding administrative or civil liability) from flooding originating on their property; (3) [the District] will not retain any authority to take any action to maintain portions of the ditch for which it loses its easement rights by virtue of nonuse, and lacks authority to direct landowners to take any such action.

"It is possible that once portions of the ditch are no longer controlled by the District, vegetation could grow along or in the ditch, and reduce the ditch's capacity to convey storm flows.  It is also possible that landowners or others could place items or soil in the ditch that would have the same effect.  It would require speculation to attempt to predict whether landowners would take any particular action, or inaction, with regard to the ditch on their property.  Either potential effect (vegetation growth or action by

23

landowners or others that alter stormwater conveyance capacity) would be indirect with respect to the Project. Moreover, the extent of any resulting changes to the ditch's stormwater conveyance capacity, or the extent of any resulting flooding, would require speculation, is impossible to forecast and is not reasonably foreseeable [citation]. Pursuant to CEQA, the District does not have an obligation to analyze speculative indirect physical changes [citation].

"With respect to the District's assumptions regarding the Project and alternatives, it is reasonable to assume that property owners are aware that the ditch receives and conveys stormwater along the ditch corridor and that they understand actions which alter the capacity of the ditch could result in an increased risk of flooding. It is also reasonable to assume that landowners would not unlawfully fill the ditch or alter the conveyance capacity of the ditch, or allow such actions to occur on their property, or otherwise fail to maintain the ditch, when the landowners have a property interest in ensuring that the ditch retains the ability to convey stormwater across and past the landowner's property. Further, it is reasonable to assume that property owners will comply with existing County regulations governing fill activities, and that the oversight and safeguards provided through that process will ensure that possible future activity by landowners or others does not substantially increase the risk of flooding on or around their properties.

"The County has jurisdiction over specified fill activities within the County and has the authority to take enforcement actions against any landowner who conducts unlawful fill activities within the ditch in a manner that alters the existing drainage pattern. Pursuant to Section 15.14.130 of the County Grading Ordinance, a grading permit is required for earth moving activities conducted on private property within the unincorporated area of El Dorado County in order to protect neighboring properties, public welfare and water quality of streams, rivers and lakes [citation.] Available County records indicate that the County previously has taken enforcement action against landowners along the portion of the Main Ditch that is no longer utilized by the District

24

(often referred to as the 'Lower Main Ditch') related to unauthorized landowner fill of the ditch. Based on the County's jurisdiction over grading activities, as well as the County's prior enforcement actions related to unauthorized fill of portions of the Main Ditch, it is reasonable to expect that future landowner fill activities that alter the drainage capacity of the Upper Main Ditch would likely be subject to County review, approval, and/or enforcement. It is also reasonable to assume that landowners would maintain their property to minimize flood risks and associated liability. Therefore, while the precise nature of any indirect physical change in stormwater conditions resulting from the Project cannot be determined, it is reasonable to conclude that the Upper Main Ditch, including portions that would no longer be used by the District, would continue to have capacity to convey stormwater runoff, similar to existing conditions, and that the Project would not result in a substantial adverse impact with respect to drainage, hydrology or flooding."

Appellant argues the assumption that property owners would maintain the ditch "is wishful thinking with no basis in fact" and "fails to acknowledge the fact that a lack of maintenance by just one landowner will result in a clogged, flooding ditch." Appellant also argues that "the 'evidence' the District relies upon" in support of this assumption is not evidence at all, but rather "conjecture and self-serving opinion." However, "[i]t is a well-established principle that 'an appellant challenging an EIR for insufficient evidence must lay out the evidence favorable to the other side and show why it is lacking. Failure to do so is fatal. A reviewing court will not independently review the record to make up for appellant's failure to carry [its] burden.' [Citation.]" (*Citizens*, *supra*, 43 Cal.App.5th at p. 635.) Appellant has failed to demonstrate, with citations to the administrative record favorable to the District, that the EIR's drainage analysis is inadequate.

Appellant does not attempt to explain why, in its view, the existing ditch cannot convey stormwater up to a 10-year storm event. Indeed, appellant concedes that the EIR's conclusion in this regard is "relatively accurate" with respect to the proposed

project.  Thus, appellant does not take issue with any of the changes made to the ditch where the new pipeline is buried along the existing ditch corridor, where the District would continue exercising its maintenance easement.  It is only where the ditch would be abandoned by the District that appellant claims the drainage analysis is inadequate.  However, as the EIR's analysis accurately explains, the existing ditch remains, unaltered by the project, except for the fact that the District would no longer maintain the portion of the ditch it no longer operates.  Stated differently, the project does not directly threaten to increase flooding risks, but rather the increased risk comes indirectly from the potential future action or inaction of property owners along the abandoned ditch segment.

To be sure, an EIR must adequately address "reasonably foreseeable indirect effect[s]" of a project.  (*Placerville Historic Preservation League v. Judicial Council of California* (2017) 16 Cal.App.5th 187, 197.)  However, we conclude the possibility that a property owner might deliberately fill the ditch at some point in the future is not a reasonably foreseeable indirect effect of the Blair Road alternative.  There is no reason to presume a property owner would do so.  Nor does appellant offer any citations to the record indicating that the County would not be able to adequately regulate such activities.  Skepticism that a property owner who wanted to fill the ditch "would surely go to the County to get a permit" is not evidence.

More foreseeable is the potential for property owners to fail to adequately maintain the ditch's capacity to convey stormwater up to a 10-year storm event.  The District's response to the County's comment letter acknowledges vegetation might grow along or in the ditch, thereby reducing the ditch's capacity to convey storm flows.  Nevertheless, the District concluded property owners would not allow their portion of the ditch to become so overgrown as to significantly reduce the ditch's water conveyance capacity, citing their own property interests and potential civil liability.  Challenging this conclusion, appellant relies heavily on a flooding event that occurred in 2017 along a different section of the Main Ditch corridor that the District had previously abandoned.

26

Appellant asserts, without citations to the administrative record, that the flooding "was largely due to the fact that the abandoned sections on private property had accumulated debris and become overgrown with vegetation, and some had even been filled in with soil."  However, our review of the record reveals that, even under baseline conditions, stormwater flows may overtop the ditch during intense rainfall events, such as the one that occurred in January 2017.  We agree with respondents' position "that the flooding risk associated with infrequent extreme storm events is part of the baseline condition, rather than a Project-related impact."

"CEQA requires that an EIR make 'a good faith effort at full disclosure.' [Citation.]  'An EIR should be prepared with a sufficient degree of analysis to provide decisionmakers with information which enables them to make a decision which intelligently takes account of environmental consequences.  An evaluation of the environmental effects of a proposed project need not be exhaustive, but the sufficiency of an EIR is to be reviewed in the light of what is reasonably feasible.  Disagreement among experts does not make an EIR inadequate, but the EIR should summarize the main points of disagreement among the experts.  The courts have looked not for perfection but for adequacy, completeness, and a good faith effort at full disclosure.'  [Citations.]" (*Center for Biological Diversity v. Department of Conservation, etc.* (2019) 36 Cal.App.5th 210, 233 (*Center for Biological Diversity*).)  We conclude this standard has been met.

**B.**

***Impacts to Biological Resources***

The draft EIR analyzes five potential impacts to biological resources.  We describe two in some detail as they are important to the issues raised in this appeal:  (1) whether the project would have a substantial effect on any riparian habitat or other sensitive natural community (impact BIO-2); and (2) whether the project would conflict with any

27

local policies or ordinances protecting biological resources, such as a tree preservation policy or ordinance (impact BIO-3).[9]

The draft EIR analyzes the Blair Road alternative's potential impact to any riparian habitat or other sensitive natural community in impact BIO-2b, which states:

"As discussed in the Environmental Setting section, the pipeline alignment under the Blair Road Alternative would be located in the disturbed area along Blair Road, a short segment of the existing ditch, and in cross-country areas. The Blair Road Alternative was identified to result in less potential biological impacts than the proposed Project because this alternative is primarily located within an existing road corridor and would require less trees to be removed. Culverted drainages in the roadway would be crossed within the road base fill in the paved road or shoulder areas. No riparian areas would be affected by this alternative since the alignment would be designed to cross

---

[9]  A third is indirectly related to a comment from CDFW, discussed below. This is whether the project would have a substantial adverse effect on federally protected wetlands (impact BIO-4). The draft EIR analyzes the Blair Road alternative's potential impact to any such waters of the United States in impact BIO-4b, which states: "As discussed in the Environmental Setting, approximately six drainages cross the Blair Road Alternative and an additional six drainages are present in close proximity to the Blair Road Alternative (Figure 2.7-2). All these drainages have existing culverts that would be undercrossed or would be avoided by the proposed Project. In accordance with MM BIO-7, Exclusion Fencing for Sensitive Resources, the District has proposed construction methodologies and exclusion area delineations to avoid potential impacts to, placement of dredge or fill material in, waters of the [United States] along this alignment. Therefore, with the application of MM BIO-7, impacts to potential waters of the [United States] are considered less than significant." MM BIO-7 requires: "The District shall install environmentally sensitive area exclusionary fencing prior to construction. The fencing shall delineate construction 'pinch points' and environmentally sensitive area buffers. For example, at culvert crossings where waters of the [United States] impacts are to be avoided, the construction area shall be delineated with exclusion fencing to limit the extent of construction activities and avoid the placement of dredge and fill material into potentially jurisdictional features. These avoidance areas would be identified prior to initiating construction activities, included within construction plans as appropriate, and would be protected by the installation of appropriate exclusion zone fencing."

culvert alignments and be limited to the areas within the disturbed footprint of Blair Road and the existing ditch. Further, based on District environmental staff assessments, the cross-country portion of the alignment would not impact riparian communities since the alignment crosses only upland habitat within the cross-country areas. Vegetation communities along the Blair Road Alternative are similar to the proposed Project and construction under this alternative would be in compliance with applicable plans and regulations, as described for the proposed Project.[10] Like the proposed Project, any required oak tree removal under this alternative would be mitigated through compliance with MM BIO-6, Avoid and Minimize Impacts to Oak Trees and Oak Woodlands[11], which would ensure that impacts to oaks and oak woodlands are less than significant as described for the proposed Project. Because the Blair Road Alternative would be within the roadway and/or areas lacking riparian habitat or other sensitive natural communities

---

**10** Impact BIO-2a describes the riparian vegetation communities in the Upper Main Ditch alignment as "primarily low stature hydrophytic vegetation within the canal itself, such as rushes, ferns, and some Himalayan blackberry. Opportunistic and invasive species, such as Himalayan blackberry, growing in regularly maintained canals are typically not considered a sensitive natural community because they typically occur in disturbed areas and displace native plant species [citation]. This poor quality and limited habitat value combined with regular maintenance of vegetation associated with ongoing operations of the Upper Main Ditch prevent the establishment of riparian habitat that would constitute a sensitive natural community. Further, maintenance activities designed to keep the ditch free of vegetation combined with the limited marginal riparian canopy and intermittent high velocity flows present in the ditch provides extremely limited and marginal habitat for non-special status fish, amphibian, and bird species within the Upper Main Ditch. In addition, no amphibian or fish species were documented during the numerous surveys conducted of the proposed Project area. As such, the proposed Project would not have a substantial adverse effect on riparian habitat or other sensitive natural communities."

**11** MM BIO-6 requires the District to avoid and minimize impacts to oak trees, heritage oaks, and oak woodlands, further described later in this opinion, "where feasible."

29

and impacts to oaks would be mitigated through MM BIO-6, the impact would be less than significant with mitigation."

The draft EIR analyzes whether the Blair Road alternative would conflict with any local policies or ordinances protecting biological resources, such as a tree preservation policy or ordinance, in impact BIO-3b, which states:

"Similar to the proposed Project, the Blair Road Alternative does not conflict with the El Dorado County General Plan Conservation Element. Specifically, the Blair Road Alternative is consistent with Goal 7.4 and the Objectives within this goal.[12] Wildlife and vegetation resources were evaluated in order to identify resources with potentially significant biological, ecological, and recreational value and [the Blair Road alternative was] found to not significantly harm biological, ecological, and recreational value of resources within the County.

"Also, similar to the proposed Project, a range of tree species were identified within the Blair Road Alternative during vehicle-based and pedestrian reconnaissance surveys. Oak species (i.e. black oaks) can be found at varying densities and areas within the Blair Road Alternative, especially along the cross-country portion. Tree removal in the cross-country portion and in work spaces would be required due to construction. Specifically, the Blair Road Alternative involves the removal of approximately 145 trees. Based on the typical distribution of tree species within the Project areas, it is reasonable to assume some of these trees would be oaks. The alternative is not anticipated to impact Heritage Tree (i.e. oak trees greater than 36-inch diameter), based on the size and number

---

**12**    Goal 7.4 of the El Dorado County General Plan, "Wildlife and Vegetation Resources," states: "Identify, conserve, and manage wildlife, wildlife habitat, fisheries, and vegetation resources of significant biological, ecological, and recreational value." Objectives 7.4.1, 7.4.2, and 7.4.4, and associated policies, provide for protection and conservation of eight sensitive plant species known as the Pine Hill endemics, critical fish and wildlife habitat, and forests, oak woodlands, and other tree resources.

of oak trees known to District staff and consultants to be in the Project area. General observations of tree species within the Blair Road Alternative alignment indicate that the composition of tree species along this alternative is similar to that of the proposed Project and, as such, it is anticipated that oak trees would comprise approximately 10 percent of the surrounding forest. The species and size of the trees that would require removal would be evaluated prior to construction and mitigated in accordance with MM BIO-6. MM BIO-6, Avoid and Minimize Impacts to Oak Trees and Oak Woodlands would be implemented for the Blair Road Alternative in order to avoid and minimize potential impacts to oaks and oak woodlands. Thus, with the implementation of MM BIO-6, the Blair Road Alternative would be consistent with the [Oak Resources Management Plan] and not conflict with a local plan or policy protecting biological resources. Similar to the proposed Project, the District would be consistent with the tree removal procedures required by the County's Tree Mortality Tree Removal Plan [citation], [and] the California Department of Forestry and Fire Protection (CAL FIRE). Therefore, impacts related to the spread of pine bark beetle would be the same as that of the proposed Project.[13] With the implementation of MM BIO-6, the Blair Road Alternative would

---

**13** With respect to bark beetle infestation, the draft EIR's analysis of the proposed project states: "The spread of pine bark beetle has been impacting forest habitat and affecting public safety. In drought conditions pine bark beetle has the potential to spread more rapidly due to the unhealthy characteristics of pine[] tree species from lack of proper water sources. This lack of water and associated unhealthy trees allows pine bark beetle to spread more rapidly which, in turn, kills more trees. The proposed Project would involve piping the existing ditch, which would result in less water for pine tree species near the existing ditch. However, because this is a mixed coniferous forested area, the root systems of these trees are typically deep and would not be significantly impacted by the removal of this water. There is no discernable difference between the overall health of the trees nearest to the ditch compared to the trees further away from the ditch, indicating that the direct relation between water loss from the ditch and tree health is limited. Additionally, tree removal within the ditch corridor would occur in order to allow adequate space for the pipeline and to prevent hazards, which would limit the

31

have similar impacts to that of the proposed Project and would therefore be less than significant with mitigation." (Fn. omitted.)

Appellant's challenge to adequacy of the EIR's analysis of impacts to biological resources begins with a complaint that "the District improperly ignored" comments from CDFW, specifically citing this one:

"Page 32 of the project's Initial Study states, 'If either of the two pipeline alignments with portions located outside of the Upper Main Ditch are chosen, then the District would acquire a Streambed Alteration Agreement (SAA) from the California Department of Fish and Wildlife (CDFW) per Fish and Game Code, Section 1600 et. seq.' Because the ditch is hydrologically connected to natural streams, conveys some natural flow, and provides wildlife habitat and resources, the Department strongly recommends that [the District] submit a Notification of Lake or Streambed Alteration prior to beginning any activity subject to notification under [Fish and Game Code] section 1602 *et seq*, regardless of the pipeline's ultimate alignment. The jurisdictional delineation prepared for the U.S. Army Corps of Engineers (USACOE) for the project should not be used to evaluate the project's impacts to streambed and riparian habitat because the specific methods used by the USACOE to delineate Waters of the U.S. (such as use of ordinary high water mark) often exclude fish and wildlife resources that may be impacted by activities subject to notification under [Fish and Game Code] section 1602." (Boldface omitted.)

In response, the final EIR states: "The comment regarding the need for a Streambed Alteration Agreement (SAA), under . . . Fish and Game Code Section 1600 is

potential for trees nearest to the ditch to be impacted by a loss of a water source. The District would adhere to governing regulations for tree removal procedures as prescribed in the County's Tree Mortality Tree Removal Plan [citation], [and] the California Department of Forestry and Fire Protection (CAL FIRE). Therefore, impacts related to the spread of pine bark beetle would be considered less than significant."

acknowledged.  However, as discussed [in] . . . the [draft EIR] . . . , the District has determined that no potentially jurisdictional features would be affected under the Project (either by the proposed Project or Alternatives).  Any jurisdictional waters would be avoided where possible in accordance with Mitigation Measure BIO-7 (Exclusionary Fencing for Sensitive Resources).  If avoidance is not feasible, then Mitigation Measure BIO-7 requires all regulatory permits be obtained which sufficiently mitigates any potential impacts that could be associated with the Project."

Appellant argues this response dismisses the comment.  Not so.  "After the designated lead agency makes a draft EIR available to the public, the public may comment on the draft.  [Citation.]  The lead agency must evaluate and respond to timely comments relating to significant environmental issues, and include the comments and responses in the final EIR.  [Citations.]  The agency's response must 'demonstrate a "good faith, reasoned analysis," ' but 'need not be exhaustive.'  [Citation.]  The response 'can be sufficient if it refers to parts of the draft EIR that analyzes the environmental impacts raised by the comment.'  [Citations.]  Furthermore, general comments can be met with general responses, and 'comments that are only objections to the merits of the project itself may be addressed with cursory responses.'  [Citation.]"  (*Los Angeles Conservancy v. City of West Hollywood* (2017) 18 Cal.App.5th 1031, 1039-1040.)

The District's response to CDFW's comment refers that agency to the portion of the draft EIR that concludes:  "The routes of the Blair Road and Combined Alternative alignments were specifically selected to avoid potential impacts to Waters of the United States.  These alignments were examined by District environmental staff for potentially jurisdictional features.  District staff determined that no potentially jurisdictional features would be affected under these alternatives . . . ."  The response also notes that implementation of MM BIO-7 would sufficiently mitigate any impacts to such waters.  Notwithstanding the foregoing, the District "acknowledged" its obligations under Fish

33

and Game Code section 1602.[14]  However, in the portion of master response-4 dealing with riparian habitat, the District explains:  "Impact BIO-2 of the [draft EIR] effectively discusses and analyzes potential impacts from loss of riparian and water resources, as regulated under [Fish and Game] Code section 1602.  The ditch does not provide adequate habitat due to the variation in flow regimes throughout the season the ditch is in use and the regular maintenance of the ditch itself. . . . As described in the [draft EIR], it is acknowledged that some riparian habitat would be lost as a result of the Project[;] however, this is not a naturally occurring waterbody or stream and the riparian habitat that has established is as a result of the manmade ditch.  It is not a natural habitat feature and dependency on the water within the ditch is opportunistic for the plant and wildlife

---

**14**      This section provides in relevant part: "(a) An entity shall not substantially divert or obstruct the natural flow of, or substantially change or use any material from the bed, channel, or bank of, any river, stream, or lake, or deposit or dispose of debris, waste, or other material containing crumbled, flaked, or ground pavement where it may pass into any river, stream, or lake, unless all of the following occur:  [¶]  (1) The department receives written notification regarding the activity in the manner prescribed by the department. . . .  [¶] . . . [¶]  (2) The department determines the notification is complete . . . .  [¶]  (3) The entity pays the applicable fees . . . .  [¶]  (4) One of the following occurs:  [¶]  (A) (i) The department informs the entity, in writing, that the activity will not substantially adversely affect an existing fish or wildlife resource, and that the entity may commence the activity without an agreement, if the entity conducts the activity as described in the notification, including any measures in the notification that are intended to protect fish and wildlife resources.  [¶] . . . [¶]  (B) The department determines that the activity may substantially adversely affect an existing fish or wildlife resource and issues a final agreement to the entity that includes reasonable measures necessary to protect the resource, and the entity conducts the activity in accordance with the agreement.  [¶] (C) A panel of arbitrators issues a final agreement to the entity . . . and the entity conducts the activity in accordance with the agreement.  [¶]  (D) The department does not issue a draft agreement to the entity within 60 days from the date notification is complete, and the entity conducts the activity as described in the notification, including any measures in the notification that are intended to protect fish and wildlife resources." (Fish & G. Code, § 1602, subd. (a).)

34

species that occur in the area. As such, it would not be considered a significant impact as regulated by CDFW."

Again, in assessing the sufficiency of an EIR's impact analysis, we do not look for perfection, or even exhaustiveness, but rather " 'adequacy, completeness, and a good faith effort at full disclosure.' [Citations.]" (*Center for Biological Diversity*, *supra*, 36 Cal.App.5th at p. 233.) The District's response was more than adequate to address CDFW's comment. To the extent the latter agency disagrees with the District's conclusions regarding impacts to riparian habitat, that disagreement was fully disclosed.

Appellant also argues the EIR fails to adequately analyze and mitigate impacts to tree mortality. On this subject, appellant submitted a comment letter that stated the following: "The Governor has issued a Proclamation of Emergency for tree mortality. The County has also declared a State of Emergency for tree mortality. Water supply plays a key role in a tree's ability to survive bark beetle infestation, and there is no discussion at all in the [draft EIR] about this issue, other than the unfounded statement that the trees near the canal have deep roots. This failure to address the impacts that will result from tree mortality violate CEQA and are also contrary to the County General Plan requirements that relate to forest health."

In response, appellant was directed to "Master Response-5 (Tree Impacts)." This response states:

"**Changes in Water Conveyance/Availability**

"Several commenters raised concerns regarding potential indirect impacts to trees from the Project's change in water conveyance and changes in water that may be available to trees from existing seepage of the Upper Main Ditch. As described in the [draft EIR] (Section 3.4), trees along and adjacent to the ditch are not riparian species. Rather, pines and oak species prevalent along the ditch are typically adaptable to variations in water availability. While the changes in water availability from seepage associated with converting the unlined ditch to a piped system may temporarily stress

trees, this stress would be similar to stress experienced during drought periods, to which these tree species are adapted to survive due to California's climatic variability. For example, trees adjacent to the ditch are the same species and size of trees as observed some distance from the ditch, which indicates that these tree species regardless of their proximity to the existing ditch can maintain tree health either with available groundwater and seasonal precipitation. While trees with shallow roots zones could be more affected by variable flows, the oaks and conifer species in the general vicinity of the Project area typically have root systems several feet in depth. The change in the amount and location of seepage associated with the proposed Project would not significantly affect the forested baseline conditions since the extent of trees potentially reliant on current seepage levels is limited to a narrow zone adjacent to the ditch. Even if trees were stressed or damaged from reduction in the amount or location of seepage there would not be a significant change to the aesthetic character, the forest production zones, or biological resources as described under the thresholds discussion above. The tree species in the Project area are thus, adaptable, and are not reliant on nearby flowing water, such as water conveyed through the ditch, to survive. Tree species may experience stress setbacks by changes in water availability if the District no longer conveyed water through the ditch as part of the Project, but these setbacks would not be expected to result in significant tree mortality or substantial impacts to the overall species community. Any tree immortality [*sic*] that may result indirectly from changes in water flows in the ditch under Project operations would likely be limited to those trees immediately adjacent to the ditch that are not otherwise removed as part of Project construction. Additionally, as described below, damaged, dead, or dying trees would be removed along the pipeline corridor in accordance with the hazard tree practices of the District. Under both the proposed Project and the action alternatives, a ditch would continue to passively convey stormwater along the existing ditch corridor and would serve as an avenue for groundwater recharge and a water source for the remaining trees adjacent to the Project

36

boundary. Therefore, there is substantial evidence to support the conclusion that the Project would not result in significant indirect impacts to trees.

"**Increased Vulnerability to Bark Beetle Infestations**

"Several commenters raised concerns about potential increased tree vulnerability to bark beetle infestations as a potential indirect impact of the Project's change in water conveyance. The commenters expressed concern that changes in water conveyance in the ditch could stress nearby trees and that this, in turn, could make these trees more susceptible to bark beetle infestation. As several commenters noted, bark beetles have the potential to spread throughout conifer trees in the area when the trees become stressed. However, there are multiple factors that contribute to bark beetle infestations, including stand composition, health and age, and the nature and extent of stressors on the trees [citation]. For example, one of the major factors that has been found to drive current outbreaks is that many conifer forests in western North America contain dense concentrations of large, mature trees that are highly susceptible to bark beetle outbreaks [citation]. As discussed above, some trees would be removed as part of the Project, and other trees could be potentially indirectly impacted by changes in the amount and timing of water that seeps from an unlined ditch, which may stress trees adjacent to the ditch. While trees that are stressed may be more susceptible to bark beetles, the number of trees that may be indirectly impacted by the Project is expected to be limited to those adjacent to the ditch, within approximately 150 feet of the ditch. The Sierra Nevada Forest Plan Amendment - Final Supplemental Environmental Impact Statement [citation] includes forested areas in El Dorado County and this document [defines] riparian width standards as a measure for what is supported by flowing water in the adjacent riparian corridor. As such, an ephemeral stream, which the ditch closely mimics [*sic*], is defined as: 150 feet on each side of the stream, measured from the bank full edge of the stream. Therefore, the area of potential Project impact in relation to the greater forest in El Dorado County supports the conclusion that the Project is not likely to contribute to a significant bark

beetle infestation [citation]. Due to the limited potential for indirect impacts to trees, and the limited numbers of such trees relative to the surrounding stand, the Project would not result in a substantial increase in vulnerability to bark beetle infestation." (Boldface added.)

Appellant argues this response "talks in circles." We disagree. The applicable standard for assessing the adequacy of the District's response has been stated, and repeated, earlier in this opinion. We decline to again repeat ourselves. Nor does this argument require a detailed analysis. The District's response thoroughly addressed the concern. Nor has appellant carried its burden of demonstrating the EIR's impact analysis on this point is unsupported by substantial evidence. We agree with respondents' position that "[t]he EIR provided facts, reasonable assumptions, and expert opinion predicated on facts, all of which constitute substantial evidence [citation] in support of [the District's] determination that the Project would not result in a significant indirect impact to trees."

## C.

### *Wildfire-related Risks*

The draft EIR analyzes potential wildfire risks associated with the Blair Road alternative in impact HAZ-3b, noting this alternative alignment "would have similar impacts related to wildland fire risk as described under the proposed Project . . . ." The portion of that analysis relevant to appellant's challenge is the following:

"The long-term fire hazard for the Project area would not be affected because operation of the Project would not create a fire hazard. The ditch itself is not a substantial water source with no appropriate infrastructure, permanent supply, or water rights sufficient for fighting fires. Operation of the proposed Project does not increase the risk of fire since the pipeline itself is passive and underground. Currently, the water in the ditch is intended for use as a drinking water supply and does not provide fire water supplies. The District maintains water rights to all the water within the ditch and it is not

available to adjacent land owners for firefighting purposes. The intermittent nature of the flows in the ditch make the ditch an unreliable water source under existing conditions and removal of the sources, under the proposed Project, would not significantly alter available firefighting water supplies[.] Additionally, mandatory evacuations would be put in place and firefighting operations would be handled by CAL FIRE, in the event of a wildfire in the Project area which would eliminate any potential for the proposed Project to further expose people or structures to the risks associated with wildfires beyond which are already present within the densely forested area. Because of all the reasons discussed, the impact from the proposed Project is expected to be less than significant."

Appellant argues this analysis is deficient because it "discusses only construction-related fire risks and is silent regarding the fact that abandoning the ditch will remove a water source as a firefighting tool." In support of this argument, appellant relies on several public comments submitted during the comment period. We provide a portion of one as a representative example: "We have a neighbor whose property and home adjacent to the canal that was told directly by the fire fighters during the King Fire that if the canal was not there, their home would have been lost."

In response, the final EIR directs the commenter to master response-2 (wildfire protection), which states in its entirety:

"Several comments were received regarding the use of the Upper Main Ditch as a wildfire protection resource and potential issues that piping the ditch could subsequently have on such a resource.

"Specifically, several references were given to the use of the Upper Main Ditch as a firefighting resource (i.e. a fuel break) during the King Fire in 2014. Figure 2.1-1 below illustrates the entire extent of the King Fire, including where the edge of the fire was effectively stopped [citation]. As shown on Figure 2.1-1, the Upper Main Ditch and the Project area was outside of the fire line. The image provided by several comments received shows the El Dorado Canal, not the Upper Main Ditch in the Project area, which

39

is approximately two miles east of the proposed Project. Further, no documentation within the incident reports provided for the King Fire indicate that the Upper Main Ditch was used by [CALFIRE] to fight the King Fire or as an essential firefighting resource [citation]. Instead, extensive use of hoses, helicopters, and vegetation removal in addition to the larger, more defined fire breaks such as the South Fork of the American River and Highway 50 were used in strategic areas where the fire risk was the greatest. Notwithstanding the specific events associated with the King Fire, recent fire behavior through the state has illustrated that minor infrastructure such as the Upper Main Ditch would have little to no effect during a wildfire and enforcing defensible space requirements as outlined under [section] 4291 is the most effective and cost-efficient way to mitigate loss of structures from the risk of a wildland fire [citation].

"Section 3.8.4.1 (Project Impact Analysis) under Impact HAZ-3 of the [draft EIR] adequately analyzes wildfire impacts and the fire hazard associated with the Project and includes the conclusion that the water within the open ditch does not provide a substantial water source for fighting fires. The lack of water within the ditch during the summer months that would result from implementation of the proposed Project would not substantially increase the risk of fire. Commenters do not provide any substantial evidence to invalidate the findings of the [draft EIR]. Similarly, commenter's identify fire hydrants as potential mitigation for fire risks; however, as described, the ditch is not considered a fire fighting resource and there are no significant impacts to be mitigated.

"The discussion below has been included to provide additional context for the [draft EIR] analysis and provides an overview of the relevant planning documents related to the fire protection services within the Project area.

"**Fire Protection Planning Documents**

"The CALFIRE 2017 Unit Strategic Fire Plan (Strategic Plan) for the Amador-El Dorado Unit discusses the goals and projects needed to 'reduce the loss of life, property, watershed values, and other assets at risk from wildfire through a focused pre-fire

40

management program and increased initial attack success' [citation]. The Project area, and the Pollock Pines area as a whole, is included within this unit of CALFIRE as 'Battalion 1'. Several current projects are identified within the Battalion 1 region, including, but not limited to, the Sly Park vegetation management project, the Prairie City OHV Park vegetation management project, the Fire Adapted 50 – Sly Park-Phase 1 project, and the [District's] Hazard Tree Removal [citation]. The current use or planned use of the Upper Main Ditch is not included in the Strategic Plan as an identified firefighting resource area or within a current or planned project area. Additionally, as shown on Figure B (Battalion Maps) within this Strategic Plan, the Upper Main Ditch is not included as a river or lake within the Battalion 1 region. Forebay Reservoir is the closest indicated lake within the Project area and would likely be utilized in the event of a wildfire.

"Battalion 1 includes several Fire Safe Council's (FSC) within its boundaries, including the Pollock Pines-Camino FSC, which has developed a Community Wildfire Protection Plan (Plan) [citation]. This Plan stresses the need to protect the watershed quality from the impacts of wildfires, including the infrastructure used to transport water from higher elevations to lower elevations. The Upper Main Ditch Piping Project is consistent with this purpose providing more reliable transport of water from Forebay Reservoir to the Reservoir 1 [WTP]. Several fuel reduction projects have also been identified in this Plan in order to support the protection of a designated fire safe zone, create and maintain fuel breaks in strategic locations, and reduce fuel loading within the Pollock Pines area. The focus of these identified projects tends to be in the northern and southern parts of Pollock Pines and are generally situated around roads, which provide existing fire breaks. The Upper Main Ditch is not identified within this Plan as a designated fire protection resource, nor does it include any planned projects involving the use of the Upper Main Ditch as a fire protection resource."

This response is more than adequate to address the comments related to potential wildfire-related risks associated with the project.  Again, we conclude appellant has not carried its burden of demonstrating the EIR's impact analysis on this point is unsupported by substantial evidence.

## DISPOSITION

The judgment is affirmed.  Respondents are entitled to costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1), (2).)


　　　　　　　　　　　　　　　　　　　　　　　　　/s/
　　　　　　　　　　　　　　　　　　　　　　　　　HOCH, J.


We concur:


　/s/
ROBIE, Acting P. J.


　/s/
RENNER, J.

Filed 2/16/22

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(El Dorado)

----

| | |
|---|---|
| SAVE THE EL DORADO CANAL, | C092086 |
| Plaintiff and Appellant, | (Super. Ct. No. PC20190260) |
| v. | ORDER CERTIFYING OPINION FOR PUBLICATION |
| EL DORADO IRRIGATION DISTRICT et al., | |
| Defendants and Respondents. | [NO CHANGE IN JUDGMENT] |

APPEAL from a judgment of the Superior Court of El Dorado County, Dylan Sullivan, Judge.  Affirmed.

Law Offices of Marsha A. Burch and Marsha A. Burch for Plaintiff and Appellant.

Somach Simmons & Dunn, Kelley M. Taber, Michelle E. Chester; Brian D. Poulsen, Jr., and Elizabeth L. Leeper for Defendants and Respondents.

THE COURT:

The opinion in the above-entitled matter filed on January 28, 2022, was not certified for publication in the Official Reports.  For good cause it now appears that the

1

opinion should be published in the Official Reports and it is so ordered.

FOR THE COURT:


  /s/
ROBIE, Acting P. J.


  /s/
HOCH, J.


  /s/
RENNER, J.

2